[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 14, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10046

_____

D. C. Docket No. 98-01851-CV-CO-E

ROLLEN JACKSON,

Plaintiff-Appellant,

versus

STATE OF ALABAMA STATE TENURE COMMISSION,
STATE OF ALABAMA BOARD OF EDUCATION,
PEGGY CONNELL, Superintendent of the
Talladega Board of Education in her
individual and in her official capacity,

Defendants,

TALLADEGA COUNTY BOARD OF EDUCATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(April 14, 2005)**

Before ANDERSON, CARNES and RONEY, Circuit Judges.

CARNES, Circuit Judge:

In 1996 the Talladega County Board of Education fired Rollen Jackson from his job as a welding instructor at Pittard Area Vocational High School. Shortly thereafter, Jackson filed a lawsuit in federal district court. In the eight years of litigation that followed, his case has been before four district court judges and two juries. It is now before this Court for the second and final time.

**I.**

Several incidents preceded Jackson's termination. During the latter part of his nearly twenty-year tenure as a welding instructor, Jackson sent numerous insulting and demeaning letters to members of the Talladega County Board of Education. Shortly before Jackson was terminated, a student in his welding class who was not wearing safety gloves was burned on his hand by a welding torch. Jackson also went to a Board meeting at which he was not scheduled to participate and distributed confidential records regarding his special education students, apparently in an attempt to demonstrate that the classes were overcrowded.

On October 25, 1996, about a week after that incident at the Board meeting, Dr. Peggy Connell, who was then the Superintendent of the Board of Education, notified Jackson that the Board had decided to consider terminating his

2

employment. A public hearing was held and the Board voted to terminate Jackson's teaching contract. Jackson filed an administrative complaint with the EEOC and, after receiving his right-to-sue letter, he filed this lawsuit in federal district court. His lawsuit claimed that Dr. Connell and the Board: 1) had impermissibly fired him on account of his race, in violation of Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981, 1981(a), and 42 U.S.C. § 1983 ("the race discrimination claim"); 2) had done so in retaliation for his speech in opposition to racial discrimination, in violation of Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981, 1981(a), and 42 U.S.C. § 1983 ("the statutory retaliation claim"); and 3) had also done so in retaliation for Jackson's exercise of his First Amendment right to free speech, in violation of the First Amendment and 42 U.S.C. § 1983 ("the First Amendment claim").

The district court, Judge Propst presiding, granted summary judgment to Dr. Connell and the Board on all counts. With regard to the race discrimination claim, the court determined that Jackson had presented no direct evidence of discrimination, but that he had presented sufficient evidence to establish a genuine issue of material fact as to the existence of a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). The court also determined that the Board had proffered a legitimate non-discriminatory reason for

3

Jackson's termination. The district court concluded, as well, that Jackson had failed to create a genuine issue of material fact regarding whether the reason proffered by the Board for his termination was pretextual. For those reasons, the court granted summary judgment in favor of Dr. Connell and the Board on the race discrimination claim.

Regarding Jackson's statutory retaliation claim, the district court determined that Jackson's speech activities were protected and that he had established a prima facie case of retaliation. However, because the district court decided that Jackson had failed to create a genuine issue of fact regarding whether the Board's proffered reason for discharge was a pretext, it granted summary judgment to Dr. Connell and the Board on the statutory retaliation claim.

As for Jackson's First Amendment claim, the district court applied the analysis set out in Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731 (1968) and Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989). It determined that Jackson's speech was a matter of public concern, that his interest in speaking outweighed the government's interest in preventing him from doing so, and that his speech played a substantial role in his termination. Nonetheless, the district court granted summary judgment in favor of Dr. Connell and the Board

because there was no genuine dispute that the Board would have made the same employment decision regardless of Jackson's speech.

Jackson appealed to this Court, and we affirmed in part and reversed in part. See Jackson v. Ala. State Tenure Comm'n, No. 99-15123 (11th Cir. Feb. 21, 2001). We held that summary judgment in favor of Dr. Connell was appropriate on all claims because she was not a decisionmaker with regard to Jackson's termination. However, we reversed the grant of summary judgment in favor of the Board on the race discrimination and statutory retaliation claims because we concluded that the Board had not articulated, as required by McDonnell Douglas, a non-discriminatory reason, or any reason at all, for Jackson's termination. Similarly, we reversed as to the First Amendment claim because the Board, not having articulated any reasons for Jackson's termination, had not established the Mt. Healthy defense that it would have made the same decision to fire Jackson regardless of his speech. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977).

On remand to the district court, the case was assigned to Judge Buttram and tried before a jury. The jury found in favor of the Board as to the race discrimination and First Amendment claims; but it returned a verdict in favor of Jackson on the statutory retaliation claim and awarded him $36,000 in

5

compensatory damages and $150,000 in punitive damages. After the verdict was rendered, it was discovered that one of the jurors had falsely answered questions about her criminal history, having failed to disclose that she was convicted for killing one of her children. For that reason, a new trial was granted. Judge Buttram recused himself before the second trial, and the case was reassigned to Judge Nelson.

Before the second trial, Judge Nelson granted summary judgment to the Board on both the race discrimination and the statutory retaliation claims, leaving only Jackson's First Amendment claim. In resolving this type of First Amendment claim, a four-step analysis applies, one step of which requires the court to determine whether the employee's interest in speaking outweighs the government's legitimate interest in preventing the speech in order to promote efficient public service, an inquiry known as Pickering balancing. See Pickering, 391 U.S. at 568, 88 S. Ct. at 1734–35; Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1563–64 (11th Cir. 1995); Bryson, 888 F.2d at 1565. If the Pickering balance weighs in favor of the government, the employee cannot prevail on his First Amendment claim, and there is no point in submitting it to a jury. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002).

6

In denying summary judgment on the First Amendment claim, Judge Nelson noted that in the proceedings before Judge Propst the district court had found that the Pickering balance weighed in favor of Jackson. Judge Nelson held that, because this Court did not disturb those findings on appeal, neither would he in ruling on the Board's motion for summary judgment. So the First Amendment claim was heard by another jury in a second trial.

After the close of evidence and before the jury instructions were given, the Board reminded the district court that Pickering balancing is to be done by the court (Judge Propst had done it). On that basis, the Board renewed its motion for judgment as a matter of law under Fed. R. Civ. P. 50, arguing that the balancing should be decided by the court in its favor. Judge Nelson overruled the Board's motion and, parting ways with Judge Propst's decision, instructed the jury to perform the Pickering balancing. That was error in light of the well-established case law dictating that the court, not the jury, must conduct the Pickering balancing. See Brochu, 304 F.3d at 1157; Beckwith, 58 F.3d at 1563–64; Bryson, 888 F.2d at 1565.

While the jury was deliberating, Judge Nelson realized his mistake and took steps to correct it. He called in the jury and explained to it that: "[Pickering balancing] is not a question for the jury; it's a question for me, one that I have to

answer. . . . [B]ecause I am going to answer question number three[, whether the Pickering balance favors Jackson,] 'no,' then that means there is nothing for you to do." After dismissing the jury, Judge Nelson directed Jackson to submit an index of instances Jackson contended were protected speech; he also instructed both parties to brief the Board's Rule 50 motion, even though he had already announced his intention to grant it. Judge Nelson died before he could enter a written final judgment.

The case was then assigned to Judge Coogler, who determined that Judge Nelson had orally granted the Board's Rule 50 motion for judgment as a matter of law and had stated his reasons for doing so in open court. Judge Coogler decided that Fed. R. Civ. P. 63 did not require him to hear the testimony of any witnesses, because in deciding a Rule 50 motion, which is what Judge Nelson had done, a court is not allowed to make credibility determinations and must draw all reasonable factual inferences in favor of the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51, 120 S. Ct. 2097, 2110 (2000). Judge Coogler completed what he viewed as the "ministerial task" of formally entering judgment in favor of the Board.

**II.**

Jackson raises several issues in this appeal. First, he contends that the prior decision of this Court reversing Judge Propst's grant of summary judgment in favor of the Board established as law of the case that Jackson had satisfied certain elements of his First Amendment and statutory retaliation claims. As a result, according to Jackson, Judge Nelson violated the law of the case doctrine by re-evaluating those elements, which led it to grant both the Board's motion for summary judgment on the statutory retaliation claim and its Rule 50 motion for judgment as a matter of law on the First Amendment claim.

Second, Jackson contends that even if the law of the case doctrine did not bar Judge Nelson's Rule 50 decision, there were subsidiary issues of fact that should have been decided by the jury before the court undertook the Pickering balancing. It was error, he argues, to take the case away from the jury before it had decided those subsidiary fact issues.

Third, Jackson contends that Rule 63 required Judge Coogler, who inherited the case from Judge Nelson, to retry it instead of simply entering judgment, and also that Fed. R. Civ. P. 52 required Judge Coogler to make findings of fact and conclusions of law. Fourth, Jackson contends that the judgment in the first post-remand trial (the one presided over by Judge Buttram) was improperly vacated.

9

Fifth, Jackson contends that Judge Nelson erred by granting the Board's motion for summary judgment on his race discrimination claim.

We will address each of Jackson's contentions in turn.

## III.

Jackson raises two arguments that rely on the law of the case doctrine. First, he asserts that this Court's decision reversing the grant of summary judgment in favor of the Board on his First Amendment claim established that the <u>Pickering</u> balance favors him. As a result, Jackson argues, Judge Nelson was barred by the law of the case doctrine from deciding the <u>Pickering</u> balance issue in favor of the Board. Second, Jackson argues that our previous decision also established that there is a genuine issue of material fact with regard to Jackson's statutory retaliation claim. Accordingly, he argues that Judge Nelson violated the law of the case doctrine by granting summary judgment in favor of the Board on that claim.

### A.

In order to establish that he was fired in violation of the First Amendment, Jackson first had to demonstrate that his speech involved a matter of public concern. <u>See</u> <u>Bryson</u>, 888 F.2d at 1565. Second, he had to establish that the "balance between the interests of the teacher, as a citizen, in commenting upon

10

matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" weighed in his favor. See Pickering, 391 U.S. at 568, 88 S. Ct. at 1734–35; see also Bryson, 888 F.2d at 1565. This step is known as Pickering balancing. Third, Jackson had to show that his speech played a substantial part in the Board's decision to fire him. See Bryson, 888 F.2d at 1565–66. Finally, even if Jackson were able to establish all three of those elements, his claim would still fail if the Board proved by a preponderance of the evidence that it would have fired him regardless of his speech. See id. at 1566. This last possibility is known as a Mt. Healthy defense. See Mt. Healthy, 429 U.S. at 274, 97 S. Ct. at 568.

When this case was first before the district court (with Judge Propst presiding), summary judgment was granted in favor of the Board on all the claims. In the course of addressing the First Amendment claim, the district court decided that Jackson's speech was of public concern, that the Pickering balance weighed in his favor, and that his speech played a substantial role in his being fired. Despite that, the court ultimately held that the Board was entitled to summary judgment because it found that "the only substantial evidence is that the same action would have been taken" regardless of Jackson's speech. In other words, the district court found that the Board had mounted a successful Mt. Healthy defense.

11

On appeal, we reversed the district court's decision on that claim, explaining that: "the Board has failed to articulate any reason for Jackson's termination and, therefore, cannot yet establish that Jackson would have been terminated absent his protected speech. Accordingly, summary judgment for the Board on Jackson's First Amendment claim was improper." In the course of our discussion, we recounted what "[t]he district court found," but we did not comment on any of its findings or conclusions other than to point out that it had erred in finding that the Board had established a Mt. Healthy defense.

Nonetheless, Jackson argues that, by deciding the Mt. Healthy issue, we implicitly held in his favor regarding the other elements of his First Amendment claim, including the Pickering balance. That means, Jackson says, that we established as law of the case that the Pickering balance favored him, and on remand the district court (this time with Judge Nelson presiding) violated the law of the case doctrine by ruling that the Pickering balance weighed in favor of the Board. That ruling was crucial to the grant of the motion for judgment as a matter of law to the Board on that claim.

"Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case. The law of the case doctrine, however, bars consideration of only those legal issues that

12

were actually, or by necessary implication, decided in the former proceeding." Oladeinde v. City of Birmingham, 230 F.3d 1275, 1288 (11th Cir. 2000) (internal quotations and citations omitted). Exceptions to this doctrine apply when substantially different evidence is produced, when there has been a change in controlling authority, or when the prior decision was clearly erroneous and would result in manifest injustice. Id.; United States v. Robinson, 690 F.2d 869, 872 (11th Cir. 1982).

The first step in the analysis is to identify the legal issues this Court "actually, or by necessary implication," decided when we reversed the district court's grant of summary judgment. See Oladeinde, 230 F.3d at 1288. Jackson says that we must have agreed with the district court that the Pickering balance favored him, because if we had disagreed we could have affirmed on the alternative ground that he had failed to establish that element. We need not decide if Jackson's missed opportunity or implicit agreement argument is correct because, even if it is, the evidence before Judge Nelson when he entered judgment as a matter of law was substantially different from the evidence upon which we based our reversal of Judge Propst's grant of summary judgment for the Board.

The prior appeal was from a grant of summary judgment based on the record before the district court at that time. The dispositive question was whether there is

a genuine issue of material fact raised by that evidence. See Fed. R. Civ. P. 56(c). Even if we necessarily decided that question in Jackson's favor during the earlier appeal, we did so only as to the Pickering balance issue framed by the facts (drawn from the evidence viewed in the light most favorable to Jackson) in that record. That is the only Pickering balance issue the district court had before it, and that is the only one that we could have implicitly decided during the appeal.

When the record changes, which is to say when the evidence and the inferences that may be drawn from it change, the issue presented changes as well. The first exception to the doctrine recognizes that the law of the case is the law made on a given set of facts, not law yet to be made on different facts. See Davis v. Town of Lake Park, 245 F.3d 1232, 1237 n.1 (11th Cir. 2001) ("Law of the case does not apply in this situation because [the later district court judge] based his post-trial order on a different record than did [the earlier district court judge] when addressing summary judgment."); Shelkofsky v. Broughton, 388 F.2d 977 (5th Cir. 1968) (reversal of summary judgment for a trial by jury would not preclude the district court from later entering summary judgment or judgment as a matter of law if the evidence offered at trial was insufficient to warrant submission to the jury); see also Oladeinde, 230 F.3d at 1289; Robinson, 690 F.2d at 872–73.

In reversing Judge Propst's grant of the Board's motion for summary judgment, we had before us limited evidence, including only excerpts from Jackson's termination hearing in front of the Board. We had the deposition of only one Board member, and he was the lone member who voted against Jackson's termination. The evidence before us did not contain even an articulation by the Board of the reasons for Jackson's termination. The Board's failure to provide any reason, legitimate or otherwise, for Jackson's termination was the stated basis for our reversal of Judge Propst's grant of summary judgment in favor of the Board.

By contrast, the record before us now contains the transcript of the two trials that followed after we reversed the grant of summary judgment. Included is the testimony of the three Board members who voted to terminate Jackson. Their testimony discusses in detail the reasons Jackson was fired. It describes, among other things, Jackson's acerbic and demeaning letter-writing campaign and its deleterious effect on the functioning of the school system. That conduct, as well as his wrongful distribution of confidential student records and his poor job performance, were among the reasons, the Board members testified, that caused them to fire him. The new evidence weighs heavily in the Pickering balance on the government's side given its need to efficiently and effectively perform its functions. See Connick v. Myers, 461 U.S. 138, 149–54, 103 S. Ct. 1684, 1691–94

15

(1983). The articulation of reasons for the termination remedies a problem that existed when the case was last before us.[1]

When, after the remand, Judge Nelson granted the Board's motion based on his decision that the <u>Pickering</u> balance favored the Board, he considered all of the new evidence. His ruling that the <u>Pickering</u> balance favored the Board based on the evidence at the judgment as a matter of law stage is not inconsistent with our earlier ruling (if we implicitly made one) that the <u>Pickering</u> balance had favored Jackson based on the evidence before Judge Propst at the summary judgment stage. Two different sets of facts framed two different issues and permitted two different rulings. Even if the law of the case is that the <u>Pickering</u> balance favored Jackson

_____

[1] Jackson relies on <u>Baumer v. United States</u>, 685 F.2d 1318 (11th Cir. 1982), for the proposition that because this evidence was available to the Board when Judge Propst first ruled on the motion for summary judgment, it should not be allowed to use the evidence now to avoid the law of the case doctrine. Jackson's reliance on <u>Baumer</u> is misplaced.

In that decision we held that the law of the case doctrine precluded the district court from ascertaining the value of an option to purchase land on the date it was granted. <u>Id.</u> at 1319. We found that, because the first time through the plaintiffs had chosen as part of their trial strategy not to make any arguments about the value of the option on that date, they were not entitled "to resurrect a previously abandoned issue." <u>Id.</u> at 1321. We further stated that "[p]ermitting evidence of the value of the option when granted was outside the scope of [the] mandate" to the district court. <u>Id.</u>

This case is different from <u>Baumer</u>. The Board never abandoned for strategic or other reasons its argument that the <u>Pickering</u> balance weighed in its favor. And our mandate to the district court contained no limitation on the evidence that could be considered on this issue on remand. To the contrary, because we reversed the grant of summary judgment, we anticipated that more evidence would be developed as the case progressed. In <u>Baumer</u> the trial had already been conducted at the time of the first appeal.

16

on the summary judgment record before Judge Propst, the law of the case is not that the Pickering balance favored him on the record as it stood when Judge Nelson entered judgment as a matter of law for the Board.

B.

For similar reasons, we reject Jackson's argument that Judge Nelson's grant of summary judgment in favor of the Board on the statutory retaliation claim violated the law of the case doctrine. Jackson's argument is that, because we reversed the grant of summary judgment for the Board on this claim in the first appeal, Judge Nelson violated the law of the case by entering summary judgment on the claim after remand. He did that before the second trial began, but after the first full trial. (As we mentioned, the judgment which resulted from that first trial was set aside because of juror misconduct.) At the time Judge Nelson entered summary judgment for the Board, he had before him the transcript of the first trial. Included in that transcript was the Board members' testimony articulating reasons Jackson was fired. That made the summary judgment issue materially different from what it had been at the time of the first appeal, when we reversed the first entry of summary judgment because the Board had not given any reasons for the termination. Different evidence, different issues. The law of the case did not

17

preclude entry of summary judgment for the Board on the statutory retaliation claim based on the record as it stood at the end of the first trial.

**IV.**

Moving away from the law of the case questions, Jackson's next contention concerns the proper allocation of responsibilities between the court and the jury in deciding the <u>Pickering</u> balance issue. Jackson contends that, even though the actual balancing is done by the court, subsidiary facts that make up the weights on each side of the scale must be found by the jury. According to Jackson, Judge Nelson erred in deciding that the <u>Pickering</u> balance favored the Board without having the jury decide the underlying facts.

"We acknowledge that sometimes a situation might present a factual dispute which must be resolved by the jury before the trial judge is able to make the law calls required" in deciding the <u>Pickering</u> balance. <u>Brochu</u>, 304 F.3d at 1158. There is, however, no categorical rule that requires the court to submit issues to the jury before it can undertake the <u>Pickering</u> balancing. When the facts underlying the balance are clear, courts can and do decide the <u>Pickering</u> balance issue without the aid of a jury. <u>See, e.g.</u>, <u>Morris v. Crow</u>, 117 F.3d 449, 458 (11th Cir. 1997). Here the relevant facts were clear.

In resolving the Pickering balance, "[o]ne relevant consideration is whether the speech at issue 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes performance of the speaker's duties or interferes with the regular operation of the [public employer's] enterprise.'" Id. at 457–58 (quoting Rankin v. McPherson, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987)).  In holding that the Pickering balance favored the government employer in the Morris case, we explained that:  "the manner in which Morris' message was expressed was disrespectful, demeaning, rude, and insulting, and it was perceived as such by Morris' co-workers.  It is not difficult to see how Morris' behavior . . . could cause serious disciplinary problems, undermine employee morale, and impair harmony among co-workers.  Indeed, it is difficult to imagine how it could do anything else." Id. at 458.

The same is true in this case.  There is no dispute that Jackson sent a number of demeaning and inflammatory letters to, among others, the Superintendent of the school, the director of the school, and members of the Board.  For example, Jackson sent a letter to the members of the Board in which he described one of the Board members as a "Grand Wizard of the Klu [sic] Klux Klan" and a "selfish, no-business-minded, insulting, disgusting person let alone a[n] ethnic genocizer [sic]."

19

He also sent a letter describing the then-assistant Superintendent as a "black overseer with his whip, riding on his stallion with all of the noble trust and loyalty that the master invested in him," and stating that after the assistant Superintendent's job is done his "Master" (the Superintendent) will "put his big black boy back in the fields." Jackson wrote another letter to then-Superintendent Dr. Connell that called her "very decieving [sic]" and stated: "I think that Dr. Connell has demonstrated how she feels about the black community. She has our vote of no confidence." There were other letters in a similar vein.

With this evidence, coupled with the testimony of the Board members at the first trial, Judge Nelson had before him enough undisputed evidence to decide that Jackson's conduct, in the words of our Morris decision "could cause serious disciplinary problems, undermine employee morale, and impair harmony among co-workers." 117 F.3d at 458.

## V.

Jackson's next contention involves Judge Coogler's actions after he took over the case. Although Judge Nelson had orally granted the Board's Rule 50 motion for judgment as a matter of law on the First Amendment claim after the close of the evidence in the second trial, he died before he made any written findings of fact and conclusions of law or entered final judgment. Without

recalling any witnesses or entering written findings of fact or conclusions of law of his own, Judge Coogler entered a formal judgment in favor of the Board based on Judge Nelson's oral grant of the Board's Rule 50 motion for judgment as a matter of law.

Jackson argues that before entering judgment Judge Coogler was obligated by Rule 63 to recall witnesses and hear for himself the testimony that had been presented at the second trial.[2] Jackson asserts that cases such as Emerson Electric Co. v. General Electric Co., 846 F.2d 1324 (11th Cir. 1988) (per curiam), and Zand v. C.I.R. Service, 143 F.3d 1393 (11th Cir. 1998), stand for the proposition that, under Rule 63, any time a judge in a civil case becomes disabled or dies before issuing findings of fact and conclusions of law, the successor judge must retry the case. Jackson is wrong.

Emerson and Zand dealt with a version of Rule 63 that was considerably narrower than the present one. See Emerson, 846 F.2d at 1324; Zand, 143 F.3d at

---

[2] Rule 63 states:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Fed. R. Civ. P. 63.

1393.  More importantly, in those two cases the underlying trials were before the bench, not before a jury.  Emerson, 846 F.2d at 1324; Zand, 143 F.3d at 1393.  Rule 63 treats bench trials and jury trials differently.  The rule gives the parties the right to insist that a witness be recalled in a bench trial.  Fed. R. Civ. P. 63 ("In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden.").  The rule does not give that right where a jury trial is involved.   What we have here is a jury trial, not a bench trial.

That leaves as applicable only Rule 63's general provision that:  "If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties."  Id.  Judge Coogler did certify that he was familiar with the record and he determined that the proceedings in the case could be completed without prejudice to the parties; Rule 63 required no more.  See id.

Jackson also contends that Judge Coogler violated Rule 52 by entering judgment without issuing findings of fact and conclusions of law.  Rule 52 requires that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law

22

thereon . . . ." Fed. R. Civ. P. 52(a). The trial we are talking about was not "without a jury;" it was with a jury.[3]

The rule also provides that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in subdivision (c)." Id. The motion we are talking about was "any other motion," because it was under Rule 50 which is not "provided" in subdivision (c). As a result, neither Judge Nelson nor Judge Coogler were under any obligation to enter findings of fact and conclusions of law in granting the Board's Rule 50 motion for judgment as a matter of law.

## VI.

Jackson's next contention is that the jury's verdict from the first trial was improperly vacated because there was no finding that the juror's undisclosed criminal conviction caused actual bias or prejudice. The reason Jackson cares is that, although the jury decided against Jackson on other claims, it decided the statutory retaliation claim in his favor and awarded him $36,000 in compensatory damages and $150,000 in punitive damages. He would be happy to have that verdict reinstated.

---

[3] Jackson argues that because the Pickering balance is an issue for the court to decide, see Brochu, 304 F.3d at 1157, the court must issue findings of fact and conclusions of law when deciding a Rule 50 motion that is based on the outcome of the Pickering balance. Not only is this interpretation unsupported by the law, but it is at war with the plain language of Rule 52.

"In reviewing a trial court's disposition of a motion to grant a new trial, we apply an abuse of discretion standard." McWhorter v. City of Birmingham, 906 F.2d 674, 677 (11th Cir. 1990). Because the trial judge is in the best position to gauge whether a trial has been contaminated by potentially prejudicial conduct, "[w]e . . . hesitate to overturn the grant of a new trial based on such grounds." Id.

The reason that Judge Buttram (the second of four district court judges to be involved in the case) granted the Board's motion for a new trial is that one of the jurors had failed to disclose that she had been convicted of a felony, though that specific question was asked during voir dire while she was under oath. It was discovered after the trial that the juror had been convicted of the murder of her child.

In addressing the prospective jurors, Judge Buttram had asked: "Are there any of you who have ever been convicted of a state offense in state court, or a federal offense in federal court, of a crime punishable by imprisonment for more than one year, and who have not had your civil rights restored?" The juror in question did not respond.

Later in the jury selection process, when that juror was introducing herself and reading the answers to a questionnaire she had been given, she stated: "Experience in a lawsuit? No. Experience as a witness in a lawsuit? No.

Experience as a juror. None." Jackson's attorney also specifically asked the jurors whether any of them had "participated as a plaintiff or defendant in a lawsuit." Again, the juror did not respond.

Just before the lawyers started asking questions, Judge Buttram asked: "Can any of you think of any other matter which you should call to the Court's attention which may have some bearing on your qualifications as a juror . . . ?" Again, the juror did not respond. Judge Buttram then stated: "In other words, . . . maybe [there is] something that you feel like you need [me] to know about that, that I have gotten close to, but haven't asked the question direct to get the response, this is an opportunity to give you to inform me of any matter that you think that I need to be aware of that would bear upon your fairness, impartiality or qualifications to serve in this particular case." Again, no response.

The point is that this juror had several opportunities to come clean with the court about her murder conviction.

In an order clarifying why he had granted the Board's motion for a new trial, Judge Buttram stated that he had "granted a new trial based solely upon the ground that one member of the petit jury was shown to have been statutorily unqualified to serve as a juror, based upon a prior felony conviction, which she failed to reveal during voir dire despite direct questioning." He also said that he

25

"did not consider the effect that said juror might have had on the outcome of the jury's deliberations or any possible bias she might have had, so [he] deemed it unnecessary to hold an evidentiary hearing on such matters."

In order to obtain a new trial "because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination[,] . . . a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 555–56, 104 S. Ct. 845, 850 (1984). It is undisputed that a question about prior felony convictions is material to jury service and that an honest answer from this juror would have provided a basis to challenge her for cause. United States v. Carpa, 271 F.3d 962, 967 n.5 (11th Cir. 2001) (per curiam) ("A pending or final felony conviction is a valid basis for challenge for cause."); see also 28 U.S.C. § 1865(b)(5). That leaves only whether the juror's failure to answer the question was dishonest, instead of inadvertent. Although the district court did not explicitly state that the juror's nondisclosure was dishonest, the court did specifically note that she had failed to reveal her prior felony conviction "despite direct questioning." We are satisfied that the court implicitly found that

26

the juror's failure to speak up was an intentional and dishonest response to an indisputably material question.

In some circumstances a juror may have forgotten about a conviction or, more likely, not realized that her conviction was covered by the question. That is not a reasonable possibility here. This juror had been convicted in 1986 for murdering her child and sentenced to fifteen years in an Alabama prison. She served three years in prison and five years on probation. She could not have forgotten that. The court asked about convictions for crimes punishable by imprisonment for more than one year. Having spent three years in prison for murder, there is no reasonable possibility that this juror could have honestly doubted that she was covered by the question.

For these reasons, we conclude that the district court did not abuse its discretion in granting the Board's motion for a new trial. See Carpa, 271 F.3d at 966–68.

**VII.**

Jackson's final contention is that Judge Nelson, after the judgment in the first trial was vacated, erred by granting summary judgment in favor of the Board on Jackson's race discrimination claim. We review de novo the district court's grant of summary judgment, applying the same legal standards as those that control

the district court.  Indus. Partners, Ltd. v. CSX Transp., Inc., 974 F.2d 153, 155 (11th Cir. 1992).

## A.

Where, as in this case, a plaintiff has no "direct evidence," circumstantial evidence of employment discrimination is evaluated under the McDonnell Douglas framework.  Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1103–04 (11th Cir. 2001).  Under it, the plaintiff must first establish a prima facie case of discrimination.  "Once the plaintiff has made out a prima facie case of discrimination, the employer must articulate some legitimate, non-discriminatory reason for the [employment action]."  Id. at 1104.  If the employer meets this burden of production, the presumption of discrimination is eliminated and the plaintiff must then establish that each of the defendant's proffered reasons is pretextual.  Id.

In order to show pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision. . . .  [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981).  "[A] plaintiff

28

withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742 (1993)). In evaluating a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

## B.

Here, neither party disputes that Jackson made out a prima facie case of racial discrimination under McDonnell Douglas. That takes us to the proffered reasons and whether the evidence creates a genuine issue of material fact as to pretext.

In their testimony the three Board members who voted in favor of Jackson's termination articulated several reasons for Jackson's termination. They cited as reasons Jackson's letter-writing campaign, his alleged filing of false expense reports, his wrongful distribution of confidential student records, his poor job

29

performance, and, according to Board member Ed McLain, his "blatant insubordination." One reason that all three of them gave was Jackson's abusive letter-writing campaign.

We have no doubt that the inflammatory and disparaging letters that Jackson sent to various members of the Board were a legitimate basis for his termination. See Rollins v. Fla. Dep't of Law Enforcement, 868 F.2d 397, 401 (11th Cir. 1989) ("[T]o qualify for the protection of the [anti-discrimination] statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable. . . . FDLE denied Rollins' applications for promotions because she had earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit. Such conduct, even when associated with complaints of discrimination, has been held to fall outside the protection of [42 U.S.C. § 2000e-3(a)] and to provide the employer with a legitimate basis for its action." (citing Whatley v. Metro. Atlanta Rapid Transit Auth., 632 F.2d 1325, 1329 (5th Cir. 1980); Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 234 (1st Cir. 1976))). Even Joe Duncan, the one Board member who voted against Jackson's termination, felt that Jackson's demeaning and offensive letter-writing campaign was a legitimate reason for his termination. He testified: "As I reflect back on

30

[Jackson's termination] hearing, I would agree that on the other good and just cause, due to the letters, we may have [had] probable cause to cancel Mr. Jackson's contract." The right to disagree does not include within it the right to keep one's job after expressing that disagreement with abusive, racist, demeaning invective publicly hurled at those with whom one serves.

Because the Board articulated legitimate nondiscriminatory reasons for Jackson's termination (specifically the letters), the burden was on Jackson to put forth sufficient evidence to raise a genuine issue of material fact with regard to whether the Board's proffered reasons for his termination were pretextual. See Bass, 256 F.3d at 1104. Jackson has failed to meet this burden.

Jackson has made no attempt to argue that his letter-writing campaign was conjured up by the Board in order to fire him. Nor would he be able to if he tried. The letters are in the record and they shout for themselves. Without addressing the content of those letters, Jackson endeavors to convince us that there is evidence that some of the Board members, in particular McLain, were racist, and that racism was the real reason the Board fired him.

In support of his assertion that some of the Board members were racist, Jackson primarily relies on the testimony of Board member Duncan. Some of Duncan's testimony arguably indicates that he believed that McLain is a racist.

31

Assuming that Duncan's opinion is admissible evidence, or even assuming that McLain is a racist, that would not create a genuine issue of material fact that the Board fired Jackson because of racism. Regardless of his opinion about some of his fellow Board members, Duncan also testified that in his opinion "due to the letters" the Board "may have [had] probable cause to cancel Mr. Jackson's contract." Duncan recognized that the Board had legitimate reasons for Jackson's termination, but he felt that it was unfair to terminate him now, when Jackson's letter writing had been going on for several years. Any "unfairness" in not permitting an employee to continue to engage in misconduct does not state a claim under federal law.

Duncan never said that Jackson had been fired because of his race. When asked in his deposition whether McLain wanted to terminate Jackson because he was black, Duncan said: "I couldn't say one way or the other." When asked whether McLain had any racial animus towards Jackson, he answered: "May have. I really don't know." The evidence at trial and the deposition testimony of Duncan, the only Board member who voted against Jackson's termination, severely undercuts Jackson's contention that the Board fired him not because of his abusive and disrespectful letter-writing campaign but because the Board members are racists.

Jackson also points to a statement in a letter that was written by someone outside the Board to then-Superintendent Dr. Connell. The letter discusses how the school should deal with the problems caused by Jackson's distributing confidential documents at a Board meeting the day before. Part of the letter to Dr. Connell says that Ralph Gaines, the Board's attorney, had stated that "this might be what we have been waiting on to move toward taking action on Mr. Jackson." Jackson argues that the hearsay in this letter is evidence that the Board was developing a pretext so it could terminate him on account of his race. This argument is not tenable.

The letter, with its "what we have been waiting on" language, does suggest that at least Dr. Connell was contemplating taking some kind of action against Jackson. (Dr. Connell was not on the Board but her recommendation to commence termination proceedings was a prerequisite to the Board firing Jackson. Even if we assume that her desire to take action against Jackson can be attributed to the Board, that does not mean that the desire was born of racism. As our previous discussion makes clear, the Board had abundant, non-racial reasons to get rid of Jackson. Jackson tells us that the Board's racial motivation must be "infer[red] from the evidence as a whole." Appellant's Br. 56. We have studied the evidence as a whole and it will not support any reasonable inference of racist motivation.

33

C.

Jackson's burden at the summary judgment stage came down to showing that there was a genuine issue of material fact as to whether the reasons the Board gave for his termination were pretextual. He could have done this by pointing to evidence that created a genuine issue that the reasons that the Board gave were false or that a discriminatory reason was more likely the cause of his termination. See Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. He failed to do so. As a result, the Board was entitled to summary judgment and Jackson is not entitled to have that judgment reversed.

**VIII.**

The judgment of the district court is AFFIRMED.