**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-13847

————————————————

OAKES FARMS FOOD & DISTRIBUTION SERVICES, LLC,
FRANCIS A. OAKES, III,

  a.k.a. Alfie Oakes,

*Plaintiffs-Appellants,*

*versus*

GREGORY ADKINS,
FREDRICK B. ROSS,
MARY FISCHER,
DEBBIE JORDAN,
MELISSA W. GIOVANELLI, et al.,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:20-cv-00488-JLB-KCD

————————————————

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

GRANT, Circuit Judge:

In spring 2020, the Covid-19 pandemic turned the world upside down. Alfie Oakes, the owner of a Florida farm and agriculture business, disagreed with the government's response—strongly—and he was not afraid to say so. He took to Facebook, where he described the virus as a "hoax" perpetrated by "corrupt world powers and their brainwashing arms of the media" to dupe "lemmings" with "COVID programming." Oakes also shared his opinions on other topics—the Black Lives Matter movement and George Floyd, to name a few.

Oakes Farms had been selling fruits and vegetables to a local school district for years, and the school board grew worried that Oakes's views about the pandemic betrayed a lax approach to food safety during a time when not much was known about Covid-19's transmissibility. Worries deepened after requests for the farm's pandemic protocols turned up nearly nothing, so the superintendent terminated the produce contract. Both Oakes and his farm sued, saying that the contract termination violated Oakes's First Amendment rights.

The district court saw things differently, and granted summary judgment to the school district. We agree. Although the owner was speaking as a citizen on important matters of public concern, the evidence shows that the school system's interests in food safety were the reasons for its decision to break ties with Oakes Farms—not its bare disagreement with his political views. Had there been evidence that the real motivation was punishing

Oakes for these views, whether about Covid-19 or racial topics, it would be a different matter. But here, the evidence is not reasonably in dispute. We therefore affirm.

## I.

Starting in 2015, Oakes Farms supplied millions of dollars in fruits and vegetables to Lee County schools, providing "apples, bananas, carrots, cucumbers, lettuce, oranges, pears and tomatoes." By all accounts, the partnership worked, and on June 2, 2020, the school board unanimously voted to renew funding for another year.

Earlier that spring, of course, the Covid-19 pandemic had arrived. Lee County school officials believed that the emerging disease was a "significant danger" to "all people" and was "easily transmitted," but much remained unknown in the pandemic's early days—recall stories of shoppers frantically wiping down groceries with disinfectant when they returned home, for instance. And in Lee County, like most everywhere else, schools physically closed their doors in March 2020 due to fears of transmissibility. To ensure that children did not go hungry in the meantime, the district offered both "drive up" and delivered meals. All that to say, school leaders were deeply concerned.

Alfie Oakes had a different perspective. On June 6, 2020 (the Saturday after the Lee County contract renewal), he put up a new public post on his personal Facebook page. In that post, Oakes asserted that "not only OUR country's economy but the entire world economy" had been "brought to ruins for no other reason

than multitudes of men and women have allowed themselves to be controlled by deceit and fear." "The corrupt world powers and their brainwashing arms of the media have proven the ability to program the masses," he continued. And that, he believed, meant that many "lemmings" had fallen victim to "COVID programming."

Oakes did not stop at Covid-19. He also lamented that even though the "COVID19 hoax did not work to bring down our great President," President Trump now faced "the black lives matter race hoax." He proceeded to disparage George Floyd, who had recently been killed, as "a disgraceful career criminal, thief, drug addict, drug dealer and ex-con." Oakes labeled Derek Chauvin—the Minneapolis police officer later convicted of second-degree murder for killing Floyd—"a 20 year public servant, who was unlucky enough to be the one having to deal with this drug addicted criminal, a true disgrace to our human race that represents all that is wrong with our society."

He next railed against the "liberal mindset that has been instilled in so many of our young generation," which has "taught them to take no personal responsibility for their actions" and caused them to believe that "if they do not succeed than [sic] they must be a victim." According to Oakes, these "lost souls without any direction or sense of purpose are so easily manipulated to blame others for their lack of self worth," and they are who "we see looting our stores, burning down our cities, defaming our

national monuments and disgracing the great men and women that built this country."

The district's superintendent, Gregory Adkins, became alarmed. He says he worried that Alfie Oakes's characterization of Covid-19 as a "hoax" could mean that there were food-safety issues and improper Covid precautions at his farm. At the district's request, its procurement director asked Oakes Farms to "forward documentation of operating procedures and/or precautions taken by Oakes Farm[s] given the current COVID-19 pandemic." But the company did not offer any direct information about Oakes Farms' own practices. Instead, it sent a set of food-safety protocols on the letterhead of "Marjon Specialty Foods," a different company that was its subsidiary. The school had no contract with Marjon Specialty Foods, and Adkins grew more troubled. That response was "inadequate" in his view, and more conversations with the president of Oakes Farms did not change his view. A former purchasing agent for the school district testified that around the same time the school's procurement director told him that another staffer (it was not clear who) had instructed the director to "find what we need to cancel this contract."

In the end, "Oakes Farms' perceived lack of concern regarding the easy transmission of COVID-19 and Mr. Oakes' belief that COVID-19 [was] not real" were, Adkins explained, at odds with the school district's "concerns for the health, safety, and welfare of the children" entrusted to its care "and the community

at large." He terminated the Oakes Farms produce contract a few days after the Facebook post.

Adkins and his chief of staff held one-on-one meetings with each school board member shortly after he decided to terminate the contract because he wanted to inform them before it hit the news. And Adkins has consistently stated that he was the final—and only—decisionmaker.

It's no surprise that the public heard about Oakes's Facebook post too—within a day it received nearly 3,000 comments, 1,400 reactions, and 877 shares. A petition calling for the contract's termination garnered over 17,000 signatures on Change.org. Adkins testified that he had "heard there was a petition," but had not seen it and did not make decisions "based on all of that noise."

Alfie Oakes did not see it that way. Together with his business, Oakes Farms, he sued the Lee County School District and its board members for First Amendment retaliation, alleging that the district terminated the contract because of his speech on matters of public concern. The operative complaint also included Florida breach of contract claims, state constitutional claims, and state sunshine-law claims.

After discovery, Adkins and the school board members moved for summary judgment, arguing that the balancing test for government-employee speech outlined in *Pickering v. Board of Education* should apply, and that the district's interest in food safety trumped Oakes's right to speak. *See* 391 U.S. 563 (1968). Oakes

countered with a summary judgment motion of his own, but only for his claims against the school district itself. He insisted that no balancing test should apply and that the safety concerns were pretextual. The district really canceled the contract, he said, because it disagreed with his views on both Covid-19 and racial issues.

The district court largely agreed with the school officials. It concluded that the *Pickering* balancing test applied given the relationship between the school district and Oakes Farms as an independent contractor, and that the school district prevailed under that analysis. *See id.* at 568. But the court went beyond the school board's own arguments. In its view, three governmental interests (rather than just one) outweighed Oakes's free speech interests: (1) health concerns and food-safety fears arising from Alfie Oakes's Covid-related comments, (2) interference with school operations by protests and threats to school board members, and (3) harm to the district's "[p]edagogical interests and reputational concerns" that resulted from Oakes's comments "contradicting the school's efforts to promote an inclusive environment cognizant of the fact that many in the Lee County School District community might be upset by the death of George Floyd." The court also granted qualified immunity to the individual defendants and dismissed the state-law claims without prejudice because all the federal claims had been dismissed.

Alfie Oakes and Oakes Farms appealed. After a brief dismissal for want of prosecution, their challenge is now before us.

## II.

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024). Summary judgment is appropriate when there is "no genuine dispute as to any material fact," making the moving party "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 n.7 (11th Cir. 2019).

## III.

The First Amendment's prohibition on any law "abridging the freedom of speech" leaves room for the government's interests when it acts as an employer or marketplace consumer, rather than as a sovereign. U.S. Const. amend. I; *see Pickering*, 391 U.S. at 568; *Bd. of Cnty. Comm'rs. v. Umbehr*, 518 U.S. 668, 678 (1996). In those contexts, to protect workplace efficiency and related interests, the government retains the ability to restrict its employees' speech well beyond the limitations it could place on private citizens. *Pickering*, 391 U.S. at 568; *see also Crandon v. United States*, 494 U.S. 152, 164–65 (1990). Otherwise, even backtalk about the most trivial internal matters could open a constitutional debate, potentially grinding essential government services to a halt. *Connick v. Myers*, 461 U.S. 138, 143 (1983).

Of course, that does not mean government employees have no free speech rights at all. *Pickering*, 391 U.S. at 568. Our cases have built a framework for vindicating public employees' First

23-13847                Opinion of the Court                9

Amendment rights while still respecting the government's legitimate workplace interests. Under the employee-speech doctrine, we work through three questions to assess whether the government has unconstitutionally retaliated against an employee's speech. *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023). *First*, did the employee speak "as a citizen on a matter of public concern"? *Id.* *Second*, did the employee's right to speak outweigh the government's interest "in effective and efficient fulfillment of its responsibilities"? *Id.* *Third*, did the speech play "a substantial part in the adverse employment action"? *Id.*

To start, we ask whether the punished employee spoke as a citizen on a matter of public concern. *See Pickering*, 391 U.S. at 568, 574. If not, the government can generally restrict her speech the same way any other employer could. *Connick*, 461 U.S. at 146. If so, it gets more complicated, requiring "a delicate balancing of the competing interests surrounding the speech and its consequences." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (quotation omitted).

Here, the speaker was not a government employee. He was the owner of a business that contracted with the government. But the Supreme Court has already confirmed that *Pickering* and the public employee speech cases that followed apply to independent contractors. *See Umbehr*, 518 U.S. at 684–85; *Mangieri v. DCH Healthcare Auth.*, 304 F.3d 1072, 1075 (11th Cir. 2002). "Independent government contractors are similar in most relevant respects to government employees, although both the speaker's

and the government's interests are typically—though not always—somewhat less strong in the independent contractor case." *Umbehr*, 518 U.S. at 684.  That's true where the speaker is the owner of a contracting company too.  *Mangieri*, 304 F.3d at 1075–76.  So the same principles govern—modified to accommodate the differing interests on each side of the ledger.  *Umbehr*, 518 U.S. at 677; *see also Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1317 (11th Cir. 2024).

The law is also clear that no First Amendment violation exists if retaliation against protected speech did not motivate the decision to end a commercial relationship.  *See Umbehr*, 518 U.S. at 685.  For liability to follow, disagreement with speech (not with a fact revealed by the speech) must have played a "substantial part" in an adverse decision.  *Green*, 73 F.4th at 1263.  The government prevails, on the other hand, "if it can show, by a preponderance of the evidence, that, in light of [its] knowledge, perceptions, and policies at the time of the termination," it "would have terminated the contract regardless of [the] speech."  *Umbehr*, 518 U.S. at 685.

In short, the school district must show either that its "legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake," or that it would have terminated the contractor relationship even without Oakes's controversial speech.  *Id.*

## A.

Oakes clears the first step of the *Pickering/Umbehr* test.  *See Pickering*, 391 U.S. at 568, 574.  When posting about controversial political topics on his personal Facebook page, on a Saturday no

less, he was speaking as a citizen on matters of public concern. *See Kennedy*, 597 U.S. at 518–19, 528. We turn, then, to the heart of the government-contractor speech analysis: balancing the school district's legitimate interests against Oakes's right to free speech. *See Umbehr*, 518 U.S. at 677. Although the district court grounded its *Pickering* conclusion on three purported governmental interests, the school district only advanced—and the evidence only supports—one. And that is whether ensuring school food safety justified the contract termination.

Because courts are not human resources departments, we engage in a "deferential weighing of the government's legitimate interests" to avoid constitutionalizing every workplace grievance. *Id.* Under that standard, we cannot say that the school district's interests here were insignificant. After all, the owner and namesake of Oakes Farms not only believed, but also felt compelled to publicly declare, that the Covid-19 pandemic was a conspiracy by "corrupt world powers" to bring down disfavored political figures, that only "lemmings" who were "controlled by deceit and fear" could be concerned about it, and that safety precautions taken in response were bringing the nation's economy "to ruins." Superintendent Adkins had more than a thin basis for alarm. The combination of all those statements is highly probative of, as Adkins himself put it, "not taking this seriously." Add to that the less-than-reassuring responses following the school district's efforts to verify the adequacy of Covid safety protocols at Oakes Farms, and we cannot discount the weight of the district's interest in ensuring food safety for its students. *See Morales v. Stierheim*, 848

F.2d 1145, 1149 (11th Cir. 1988) ("State interests weigh heavily where an employee's speech thwarts the mission of the agency or impedes the performance of the speaker's duties.").

Adkins always—both publicly and privately—grounded his decision to cancel the contract on his concern for food safety. He testified that "[s]taff brought to [him] a concern about the lack of protocols that Oakes Farms had in terms of how it handled its food." That those worries blossomed into an investigation of Oakes Farms' antivirus protocols underscores their grounding in food safety. As Adkins explained, "Oakes Farms' perceived lack of concern regarding the easy transmission of COVID-19 and Mr. Oakes' belief that COVID-19 is not real" threatened "the health, safety, and welfare of the children" at Lee County schools. And he said that knowing the decisions he made "impact[ed] the lives of our students" and "their families," he needed "to err on the side of safety, particularly during a health crisis pandemic." We should be clear that this testimony supports the argument that Adkins's concern was food safety—not disagreement with Oakes's views about Covid.

To be sure, it appears obvious that Adkins *did* disagree with Oakes about Covid-19. But that difference in viewpoint was not the basis for his actions—a concrete concern about food safety was. That Oakes's speech alerted Adkins to the concern does not mean that he was being punished for his viewpoint, just like firing an employee after he confesses to embezzlement is not the same as

punishing him for his different perspective on personal use of company funds.

There are fair questions about the strength of the district's interests because of what we know today about how Covid-19 spreads and its relationship to food safety. And Oakes Farms points to an FDA statement printed on the Marjon Specialty Foods protocols it handed over to school officials: "Currently there is no evidence of food or food packaging being associated with transmission of COVID-19." But the uncertainty and fear that were almost omnipresent during June 2020 make a demand for perfect scientific precision unfair to the school district. And poking holes in its choices with the benefit of hindsight is far from the deferential posture we assume when reviewing the government's interests. *Umbehr*, 518 U.S. at 677, 685.

That is not to say that any government fear justifies terminating a contract based on a contractor's speech. If Oakes owned a company that provided the school district with software, his views on Covid-19 would likely have been irrelevant. It would have been much harder for the district to show that it canceled the contract for any reason besides disagreeing with his viewpoint on Covid (or any of the other issues). But here, the tight connection between produce and physical health gave the government's interests significant heft.

No doubt, Alfie Oakes's interests were also substantial. He was speaking on matters of great public concern and widespread discussion. He posted on his personal Facebook page on a

14                    Opinion of the Court                    23-13847

Saturday, and the speech drew no direct connection to his contract with the district. But ultimately, when viewed with the required deference, the school board's interests in ensuring the safety of food served to its students outweighed Oakes's right to free expression.[1]

**B.**

Oakes responds that, regardless of the strength of these food-safety interests, they are irrelevant because they did not really motivate the school district's decision. The talk of food safety was a pretext for the district's real concerns, he says—Oakes's statements disparaging Black Lives Matter and George Floyd. Oakes is, in short, attempting to generate a factual dispute about what drove the district to terminate the contract.

Which party prevails on the balancing test is a question of law, and when the facts are clear, "courts can and do decide the *Pickering* balance issue without the aid of a jury." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1285 (11th Cir. 2005); *Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007). But as in any other context, if a question of material fact exists, summary judgment is off the table and a jury is needed. *Jackson*, 405 F.3d at 1285.

---

[1] Because we have concluded that Oakes Farms has shown no constitutional violation, we need not analyze whether qualified immunity would have protected the individual defendants. *See Ross v. Clayton County*, 173 F.3d 1305, 1310 (11th Cir. 1999). The same is true for municipal liability and the claims against the Lee County School District itself. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir. 1989).

"An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements." *Waters v. Churchill*, 511 U.S. 661, 681 (1994) (plurality opinion); *see also Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). As a result, we have to sift out whether those other statements motivated the contract's termination. If the plaintiff is able to show that the speech "was a substantial motivating factor," the government has to "prove that it would have terminated" the contract "even in the absence of his speech." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

Here, there is not enough evidence for a reasonable jury to conclude that Oakes's speech about Black Lives Matter and George Floyd had anything to do with the contract's termination. Adkins did not waver, whether in public or private communications, in saying that the decision to terminate the Oakes Farms contract was his alone and that it was solely based on food-safety concerns.

For his part, Oakes points to a few pieces of evidence. He starts with a school board member's comment that the termination reflected the district's commitment to "values of diversity and inclusion and condemn[ing] racism in all forms." But as we have already explained, the school district showed that Adkins alone was responsible for ending the contract, and that he told school board members only after he had already reached that conclusion. One statement from a non-decisionmaker who was informed after the fact is not enough to cast doubt on the district's explanation.

Nor does Oakes's other evidence move the needle. That includes a former school district employee's testimony that he heard one-half of a phone conversation. According to that witness, he was sitting in the school procurement director's office when the director received a call—from whom, it was unclear, except that the witness did not "think it was a board member" and guessed that it may have been "somebody in between." After the call, the procurement director told him that the caller said to "go look at the terms" of the Oakes Farms contract and "find what we need to cancel" it.

This evidence is ambiguous—it says nothing about *why* the district wanted to cancel the contract. Indeed, the school district would need to know how to cancel the contract no matter why it wanted to do so. Especially in light of the ample evidence that food-safety concerns guided the decision, this alleged statement fails to raise a genuine dispute that the Covid concerns were pretextual. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).[2]

Oakes also cites the superintendent's failure to clarify that Covid alone motivated the cancellation when responding to an email congratulating him for terminating the contract due to "racism." But a brief reply email that does not rebut every

---

[2] In any event, the witness's statements about what the procurement director told him concerning the phone call may well have been inadmissible hearsay. *See* Fed. R. Evid. 801 (hearsay). *But see* Fed. R. Evid. 803(3) (hearsay admissible to prove intent or motive).

23-13847                Opinion of the Court                17

statement the author disagrees with hardly signals acceptance of those assertions. Nothing in Adkins's email implied that Oakes's views on race played any part in his decision. And Covid concerns were raised throughout the process, but there is no evidence that the officials discussed racism, Black Lives Matter, or George Floyd as reasons to terminate the contract.

The district's chief of staff similarly testified that "I know our focus internally was on the COVID-19 protocols and the health and safety of our kiddos," and agreed that the district "didn't make any decisions based on other topics such as racism, George Floyd, or Black Lives Matter." The chief financial officer echoed the same view: she had "shared the concern that we had" about Alfie Oakes describing the pandemic as "a hoax." And, she explained, that concern was reinforced when the district "had not received sufficient information" in response to officials' request "for specific safety protocol." So, "based on that, . . . we needed to proceed with a cancellation of [the] contract." To leave no doubt, she underscored that "[t]he question, as far as we were concerned . . . was just related to what safety protocols is the company taking in order to prevent the transmission of COVID to . . . students and staff."

We could go on. The point is that the school district has presented no shortage of evidence that student safety drove its actions.[3]

_____

[3] Oakes Farms also argues that the state's sunshine laws prohibit us from looking at most of this evidence because local governments in Florida only

But let us be clear—if there *were* evidence of retaliation against Oakes because of his views on Black Lives Matter or George Floyd, that would be completely out of bounds. And the district court was incorrect to suggest the contrary. For example, it concluded that "Mr. Oakes's speech contradicted the messages of inclusion and anti-racism that the School District was promoting to its students," a concern that is plainly irrelevant to his company's food-services role. And the court also mused that "[p]rotests, and even the threat of protests, weigh in favor of the government's legitimate interest in avoiding disruption." This kind of heckler's veto concern is not enough to survive First Amendment scrutiny. *See Kennedy*, 597 U.S. at 543 n.8; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1274–75 (11th Cir. 2004). "Speech cannot be . . . punished or banned[] simply because it might offend a hostile mob." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). But the school district never advanced these interests and Oakes Farms has not shown that the decisionmakers were motivated by them, so we need not consider them here.

## C.

Oakes's last assertion gets no further. He says that, in the school district's own account of its food-safety motivation, Adkins did not make the contract-termination decision based on Oakes's "actual speech." Rather, Oakes argues, Adkins claims to have

---

"speak" through "official records." But that argument confuses state administrative procedures with federal evidentiary law. *See United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999).

reacted to fears about hygiene and sanitation at Oakes Farms' facilities, so there is no speech to apply *Pickering* to. We disagree. To start, analyzing the contract's termination under *Pickering* and *Umbehr* makes sense because the school district argues that the beliefs expressed in Alfie Oakes's speech caused it to lose confidence in his company's Covid protocols. But we are not sure where this argument would get Oakes in any event: even if it were correct, that would mean that he had no First Amendment cause of action to begin with. *DeMartini*, 942 F.3d at 1289. Losing a cause of action to save himself from *Pickering* and *Umbehr* would hardly be a victory for Oakes.[4]

★　　★　　★

Public employee speech cases often present close questions. And to be fair, we can understand why Alfie Oakes assumed that his speech on controversial racial topics must have motivated the contract termination. The problem for him is that the evidence did not support that supposition. Because Oakes Farms has not shown that the school district's food-safety concerns were pretextual, we **AFFIRM** the entry of summary judgment.

---

[4] We can discern no abuse of discretion in the district court's decision to decline to exercise supplemental jurisdiction and dismiss without prejudice the state-law claims because all claims raising federal questions had been dismissed. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).