United States Court of Appeals,

Eleventh Circuit

No. 95-3306.

Cynthia MORRIS, Plaintiff-Appellee,

v.

Lawrence W. CROW, Jr., as the Sheriff of Polk County, Florida and individually, Don McDaniel, Under-Sheriff of Polk County, Florida and individually, Paul F. Alley, individually and in his official capacity as Colonel of the Polk County Sheriff's Office, Defendants-Appellants.

May 21, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-301-CIV-T-17B), Thomas G. Wilson, Magistrate Judge.

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM.

Sheriff Lawrence W. Crow and Undersheriff Don McDaniel appeal from a judgment entered against them in their individual and official capacities, following a jury trial, in this First Amendment case brought under 42 U.S.C. § 1983. The dispositive issue in the case is whether the speech for which Cynthia Morris was allegedly disciplined is sufficiently protected by the First Amendment to prohibit her employer from taking action in response to it. We hold that, taking the manner, time, place, and context of Morris' speech into account, her interest in engaging in that speech is outweighed by her employer's interest in promoting the efficient administration of the Polk County Sheriff's Office. Therefore, we reverse the judgment of the district court and remand for entry of judgment in favor of the defendants.[1]

I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In 1977, Morris began working for the Polk County Sheriff's Office. At that time, Louie Mims was Sheriff. Morris was initially hired as a clerk and typist, but she later became a deputy, and still later was promoted to detective. In November 1992, Morris was transferred to patrol duty,

---

[1]The defendants also raise on appeal issues concerning qualified immunity, jury instructions, punitive damages, and remittitur. In view of our holding that the defendants are entitled to judgment as a matter of law on the merits of Morris' First Amendment claim, we need not and do not decide those issues.

and then to the Corrections Department. That transfer to the Corrections Department gave rise to this lawsuit, in which Morris alleged that the transfer was in response to her exercise of her First Amendment right to endorse former Sheriff Mims in the 1992 elections, instead of Crow, the current Sheriff.[2]

The evidence at trial demonstrated that, in general, Morris performed her duties adequately and received good evaluations, though her work history with the Sheriff's office was not problem-free. Morris' husband, whom she met on the job, also worked at the Sheriff's Office at one time. Eventually, for reasons unrelated to this case, Sheriff Crow fired Morris' husband. That occurred several months before the 1992 elections, and Morris does not contend that her husband's firing was related in any way to his or her support of Sheriff Crow's opponent.

At trial, testimony was presented to the effect that, after her husband's termination, Morris complained bitterly, loudly, and often. For instance, Major Grady Judd, one of Morris' superior officers, testified that Morris made comments to him that were more or less as follows: "[T]hose motherfuckers, they got my husband and I'm going to get those son-of-a-bitches. And it makes me sick to my stomach every time somebody walks out of this office that I think I might have made a positive impression for that son-of-a-bitch, Lawrence Crow." One of Morris' colleagues in the Sheriff's Office, Officer Michael Schreiber, testified that Morris became very loud and upset when he inquired how her husband was doing, and that she responded loudly, "Those fucking people down there, they've ruined my husband's life. And those damn people are going to pay for it." Morris' coworkers testified that during tirades such as these, Morris did not comment about her support of former Sheriff Mims, but simply disparaged Crow's administration and his decision to terminate her husband.

On the morning of election day in 1992, Morris reported to work. Her husband, apparently still unemployed, reported to a polling precinct to campaign for former Sheriff Mims. After Morris

---

[2]Crow contended at trial that he transferred Morris to Corrections, because he believed she would fare better in a position in which she would not have direct contact with the public, due to her volatile personality. However, the jury rejected that explanation, finding that Morris' speech activities were the substantial motivating factor in her transfer.

reported to work, she informed her supervisor that she was going to visit her husband during her lunch break. On that day, several Sheriff's Office employees had taken the day off to campaign for Sheriff Crow, and were traveling in a motor home from precinct to precinct. Those employees arrived at the same polling place where Morris' husband was working, before Morris herself got there.

At trial, slightly different versions were presented of the precise sequence and details of the events that took place after Morris arrived at the polling place, but the gist of the various accounts is the same. Based on that testimony, it appears that Morris was dressed in plain clothes when she arrived, and that she drove a small unmarked white Buick which, though it belonged to the Sheriff's Department, had no external flashing lights. Nevertheless, several witnesses testified that they believed Morris was on duty, because she was driving a Department vehicle. Morris testified that she announced loudly to the group that she was on her lunch hour. In any event, things got heated up at the polling place after Morris got there.

When Morris arrived, she immediately noticed that her husband was not holding his Mims sign and waving at passers by. Instead, he was chatting with some of his former coworkers from the Sheriff's Department. This did not set well with Morris. According to the trial testimony, Morris "jumped" out of the car and screamed at her husband to "Get his ass out next to the street and hold the sign properly and wave and smile." Apparently, Morris thought her husband needed a sign-waving lesson, because she then picked up the sign and yelled, "I'll show you the fucking way how to hold this motherfucking sign to campaign." Morris then began to wave at passers by, while holding the sign. After the demonstration, Morris' husband took the sign back. During this demonstration, Captain Mac Hall (one of Morris' supervisors) was standing and watching nearby. According to Captain Hall, Morris then "turned to me and pointed her finger at me, and told me that she was on her fucking lunch hour and she had a right to vote and this is the way she was doing it," and "[t]hen she proceeded to still yell and scream and told me that if Sheriff Crow had not fired her husband, that he would be holding a fucking Crow sign also."

Although Morris admitted that she used profanity at the polling place and in Captain Hall's

presence, she testified that she did "not direct it right to him" and did not intend to show him any disrespect. However, all of the other witnesses to the incident testified that she had addressed Captain Hall in a disrespectful, shocking, hostile, embarrassing, and insubordinate manner. Lieutenant William Isbell described the situation as follows:

Q. Can you describe for the jury what her appearance was, what her demeanor and attitude was out in the general public that day?

A. I would call it a grandstand. I would call it creating a spectacle. Anyone who was not familiar with the situation would certainly have interpreted this as being very derogatory and it certainly would have caught their attention.

Q. Did her demeanor and attitude appear hostile to you?

A. In general it appeared hostile.

Q. Did it appear unprofessional?

A. Very definitely.

Q. Did it appear disrespectful toward her—one of her superiors, Captain Hall?

A. Not only disrespectful to Hall, disrespectful to the sergeant and myself and everyone who was there that was associated with the sheriff's office. Everyone, I believe, was embarrassed.

Q. Can you tell us—did you observe Captain Hall's reaction to this onslaught of words she was using?

A. He appeared to be embarrassed. The decision was made very soon that we would move on, that we would go elsewhere rather than remain and be subjected to this.

Q. And can you tell the jury what your reaction was as a lieutenant with the Polk County Sheriff's Office observing one of the employees acting like this in public?

A. Plain and simply, I was very embarrassed.

Lieutenant Anna Kestner's testimony was similar:

Q. Describe the conversation with Mac Hall. Where were they standing. How did it go?

A. Basically, they were standing on the right-of-way at the driveway leading into this church which was a polling location. Just after you get off of the right-of-way, you go into what's the parking area which is, as I recall, it was a grassy area where everybody parked to go in.

    ....

Cindy Morris and Captain Mac Hall began to have a conversation. And at that time point, I moved further away from them a little more down the road. I was probably, approximately, 20 feet away from them. I don't know what their conversation was about as I walked off.

....

Q. Did you hear Captain Hall say anything?

A. No. Basically, I don't recall any conversation from him. And like I said, as I was first there it appeared like it was just conversation. And then as I walked away to hold my sign up, I noticed that suddenly Cindy's voice got louder and louder and escalated.

So then I turned around to look at what was going on, and at that point basically she was screaming at Captain Hall, you know, in a real loud voice that it was the sheriff's department's fault because she had to take a loan because she had to pay her fucking bills. And if the sheriff's department hadn't fired her husband that she wouldn't be in this problem. And that's why she had to come out and support Louie Mims for sheriff because maybe she could get a better fucking deal that way.

And those are not quotes as I tell them to you, that's how I remember the gist of what was said. And I do recall that the word fuck was interlaced throughout the conversation repeatedly during that time.

I also could tell that it had become an agitated conversation on her part because as I looked back at them, they would have been standing with their signs to me, both of them, and Cindy's body stance at that point was slightly leaned in towards Captain Hall more as though she was kind of up in his face, and her body appeared to be real tense as her voice escalated and she got louder and louder.

Q. And was the profanity in a constant stream?

A. Yes, it was constantly interlaced throughout the dialogue.

....

Q. What was Captain Hall's apparent reaction to this happening at the polling place?

A. From what I could see, he didn't say anything while that part was going on that I looked at. He appeared to just be standing there, just kind of standing straight looking at her. My impression would be of a person that was kind of shocked by what was going on.

....

Q. How did it make you feel?

A. It made me feel very embarrassed. And we left very shortly after that because of the situation, because it was so embarrassing....

Deputy Sheriff Deborah Osborn described the scene as follows:

Q. Would you tell the jury what her speech—what type of words you heard?

A. She said fuck. She said shit. She was very loud. She was very sarcastic and she was—she used totally inappropriate language to a supervisor as far as I'm concerned.

Q. Did it appear to you that she was directing her comments to Captain Hall?

A. Yes.

Q. You've told us you're now a deputy sheriff and you've also studied criminal justice. Did it appear that she was showing any respect to her superior at all?

A. Not at all. Not only to the captain, but there was a lieutenant and a sergeant there also, and to me that was totally inappropriate to a supervisor.

Q. Did you hear anyone from the Polk County Sheriff's Office group laughing and hooting and hollering about what was going on?

A. No. We were all very shocked and embarrassed.

Lori Lockwood, a secretary in the Sheriff's Department, made similar observations:

Q. And would you describe to the jury what you observed about the nature of [Morris'] conversation with [Captain] Mac Hall?

A. Again, I don't remember the exact words, I remember it was very—what I would consider very insubordinate because he was a supervisor. Again, very—a lot of foul language was used. Just—you could just tell it was very—she was very unhappy.

....

Q. What was your reaction to this scene that you were observing?

A. Shocked that someone would speak to a supervisor that way. And just embarrassed because there were so many other people around.

....

Q. You told us about your reaction standing there. Can you describe to the jury what Captain Hall's reaction was?

A. He held it very well. He remained, in my opinion, somewhat calm to have someone standing there talking to him like that. He—after that, we left shortly after that because we didn't want to cause a scene.

Q. Did you feel that the nature of Cindy Morris's actions that day showed any respect to her supervisor?

A. No.

Following the polling place episode, Captain Hall related the incident to his supervisor, Major Judd. Judd then met with several other managers at the Sheriff's Office, and the group recommended to Undersheriff McDaniel that Morris, as well as two other Mims supporters, be transferred or terminated. McDaniel met with Sheriff Crow and recommended that all three employees be terminated. Instead, Crow transferred the three to the Corrections Department. One of those other employees brought a separate lawsuit, and when he was asked in his deposition about that employee's transfer, Crow explained that he did not "think it takes a rocket scientist to figure

out if a person is working for me they've got to support me and believe in the way I run the Polk County Sheriff's Office and what my policies and procedures are and what I stand for."

Morris testified at trial that her position in the Corrections Department is the least desirable job she has performed for the Sheriff's Office. Although her rate of pay is the same, Morris lost the use of her take-home vehicle, is no longer recognized as a law enforcement officer, could no longer use her detective skills, and lost her eligibility to do "Signal 15" (off duty) work.

Morris filed a 42 U.S.C. § 1983 action against Sheriff Crow, Undersheriff McDaniel, and Colonel Paul F. Alley, alleging that they had violated her First and Fourteenth Amendment rights. Morris sought damages and injunctive relief. The district court dismissed the claim for punitive damages against the defendants in their official capacities. Thereafter, Morris amended her complaint to add counts for retaliatory denial of promotion and retaliatory transfer. Those additional counts were later dismissed and are not at issue on appeal.

The case was initially assigned to a district judge, but was tried by a magistrate judge by the consent of the parties. The defendants moved for a directed verdict at the close of Morris' case and renewed that motion at the end of trial. The magistrate judge denied those motions, except as to Defendant Alley. The jury returned a verdict for Morris, awarding her $107,600 in compensatory damages and $10,000 in punitive damages ($5,000 each against Crow and McDaniel). Thereafter, the magistrate judge denied the defendants' renewed motion for judgment as a matter of law or for a new trial, as well as their motion for remittitur. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews *de novo* a district court's rulings on motions for summary judgment and for judgment as a matter of law, applying the same standards as the district court. *E.g., Daniel v. City of Tampa,* 38 F.3d 546, 549 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995). Those standards require the Court to review the evidence in the light most favorable to the non-moving party, and to affirm denial of the motions, unless the "facts and inferences point overwhelmingly in favor of [the movant], such that reasonable people could not arrive at a contrary verdict." *Id.* (citation and internal quotation marks omitted). The issue of

whether Morris' activities are protected speech is a question of law, which this Court reviews *de novo.* *Martinez v. City of Opa-Locka,* 971 F.2d 708, 712 (11th Cir.1992).

### III. ANALYSIS

### A. WHY THIS CASE IS NOT A POLITICAL PATRONAGE CASE

Before turning to the dispositive issue in this case, it is worthwhile to point out that political patronage is *not* at issue here, although at first blush it might seem to be raised by the facts.

The First Amendment prohibits a public employer from conditioning employment on a basis that violates an employee's freedom of expression. In general, there are two methods by which a public employee can enforce that prohibition by litigation in the federal courts. "These two methods make a distinction between cases involving employee political patronage and cases involving employee speech." *Stough v. Gallagher,* 967 F.2d 1523, 1527 (11th Cir.1992) (citation omitted).

Political patronage cases are governed by two major Supreme Court cases: *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). As we have explained:

> The [*Elrod/Branti* ] method does not require open-ended inquiries into specific work-place relationships that may underlie overt expressive conduct because the public employee's interests and the public employer's interests are essentially fixed and unvarying in the raw political patronage context.

*Stough,* 967 F.2d at 1527 (citations omitted). Under *Elrod/Branti,* the "relevant inquiry is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* (citation and internal quotation marks omitted). Our circuit has not limited political patronage cases strictly to those cases involving *party* affiliation, but has recognized that the *Elrod/Branti* analysis applies whenever public employment is "conditioned upon political allegiance and not upon the content of expressions of political beliefs." *Terry v. Cook,* 866 F.2d 373, 377 (11th Cir.1989).

Nevertheless, we have emphasized that "it is important to retain the distinction between actions that assert employees' right of expression and actions that challenge discharge decisions based on political patronage." *Id.* It is important to retain the distinction between political patronage cases and free expression cases, because the analysis applicable to the two types of cases

is markedly different. *See id.* at 376-77. As we have explained, "cases involving the overt expression of ideas or political speech, unlike political patronage cases, require the open-ended inquiry or method of analysis the Supreme Court established in *Pickering [v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ]." *Stough,* 967 F.2d at 1527 (citation and internal quotation marks omitted).

Although Morris' complaint might be read to state a claim under both theories, the case has proceeded as a pure political speech case. The jury was not instructed on a political patronage theory, and the parties' First Amendment arguments on appeal are based solely on the application of the *Pickering* analysis to this case. Because Morris did not press an *Elrod/Branti* political patronage claim in the district court, we have no occasion to discuss the relative merits of such a claim under the facts of this case. We do not mean to imply that Morris' case might have been meritorious had she pursued a political patronage theory. To the contrary, we have doubts about that, but those doubts require no discussion in view of Morris' decision not to pursue an *Elrod/Branti* theory. Therefore, we will focus the remainder of our analysis on the theory that Morris did pursue—freedom of expression.

## B. WHETHER THE DEFENDANTS WERE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE MERITS OF MORRIS' FREE EXPRESSION CLAIM

This Court has established a four-part test for determining whether a public employer has unconstitutionally demoted or discharged a public employee in retaliation for the exercise of free speech rights:

> First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.

*Morgan v. Ford,* 6 F.3d 750, 754 (11th Cir.1993) (citations and internal quotation marks omitted), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). The first two steps present questions of law; the second two present questions for the fact finder. We begin with the legal

questions, and finding them dispositive, we forego discussion of the factual questions.

### 1. Whether Morris' Speech Addressed a Matter of Public Concern

To fall within the realm of "public concern," an employee's speech must relate to a "matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). "Absent extraordinary circumstances ... First Amendment protection remains unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee on matters only of personal interest.' " *Morgan,* 6 F.3d at 754 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690). The court must discern whether the employee "spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." *Id.* (citations omitted). "To accomplish this, a court considers the content, form and context of a given statement, as revealed by the whole record." *Id.* (citation and internal quotation marks omitted).

The public concern issue is a close one in this case. The "speech" for which Morris seeks protection—waving a campaign sign at a polling place—is core First Amendment activity. Were we able to segregate Morris' sign-waving from its context, it would be patently obvious that her speech addressed a matter of public concern. However, when the "content, form and context" of Morris' sign-waving demonstration are fully considered, the result is not so obvious. The form and context of Morris' speech is that she was engaging in a vituperative outburst expressing her anger that Crow had fired her husband. There is no evidence that Morris' speech at the polling place included any commentary on the relative qualifications of the candidates; she simply showed her husband how she thought he should be holding the sign, while her verbal commentary centered on Sheriff Crow's decision to terminate her husband. Moreover, an employee's *motive* for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern. *Goffer v. Marbury,* 956 F.2d 1045, 1049 (11th Cir.1992). Here, there is no dispute that Morris' dissatisfaction with Crow's decision to fire her husband played a substantial role in her sign-waving at the polling place. Nor is there any dispute that the firing of her husband was unrelated to any political expression or participation.

Despite the taint of private concerns that emanates from the form and context of Morris' sign-waving demonstration, we are not entirely sure that Morris' speech may not "be fairly characterized as constituting speech on a matter of public concern." *Morgan,* 6 F.3d at 754 (citations and internal quotation marks omitted). Because we need not decide that matter in order to decide this case, we will assume for present purposes that Morris' speech constituted speech on a matter of public concern. We turn now to the *Pickering* analysis.

### 2. *Pickering Balancing*

The *Pickering* balancing test requires us to consider whether Sheriff Crow's interest in promoting the efficiency of his administration outweighs Morris' interest in engaging in her First Amendment activity in the manner that she chose for doing so. Our task, as defined by the Supreme Court, is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

In performing the *Pickering* test, we cannot consider Morris' speech in a vacuum. Instead, "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987); *see also Connick v. Myers,* 461 U.S. 138, 151-54, 103 S.Ct. 1684, 1692-93, 75 L.Ed.2d 708 (1983) (applying same analysis). As the Supreme Court said in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979), "When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." One relevant consideration is whether the speech at issue "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes performance of the speaker's duties or interferes with the regular operation of the [public employer's] enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

Although Morris' sign-waving, in and of itself, cannot fairly be viewed as impairing discipline or harmony among coworkers, it was inextricably intertwined with her profane chewing out of one of her superiors—in full view of her co-workers.[3] To say the very least, the manner in which Morris' message was expressed was disrespectful, demeaning, rude, and insulting, and it was perceived as such by Morris' co-workers. It is not difficult to see how Morris' behavior at the polling place could cause serious disciplinary problems, undermine employee morale, and impair harmony among co-workers. Indeed, it is difficult to imagine how it could do anything else.

The First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, simply because the employee recently has waved a political sign, or was waving the sign while conducting the attack. Morris' conduct at the polling place is clearly of the kind that "impairs discipline by superiors or harmony among coworkers, [or] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. Accordingly, her employer's interest in preventing those results outweighs her interest in expressing her views—at least in the manner in which she chose to express them.[4] The Sheriff was, at the very least, entitled to transfer Morris to

---

[3]In so characterizing Morris' conduct at the polling place, we are mindful of our duty to review the evidence in the light most favorable to Morris, *e.g., Daniel v. City of Tampa,* 38 F.3d 546, 549 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995), and of Morris' testimony that when she used profanity in her conversation with Captain Hall, she did "not direct it right to him" and did not intend to show him any disrespect. [R8:187-88] However, even taking as true Morris' testimony about her subjective intentions, the undisputed evidence in the record reveals that any benign intentions she may have had were completely lost on her audience. For purposes of determining whether speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes performance of the speaker's duties, or interferes with the regular operation of the [public employer's] enterprise," *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, the perceived character of the speech is more relevant than the subjective intentions that accompany its delivery.

[4]Morris points to *Waters v. Chaffin,* 684 F.2d 833 (11th Cir.1982), as authority for the proposition that even her use of profanity at the polling place was protected speech. In *Waters,* we held that a police officer could not be disciplined for calling the police chief a "bastard" and a "son of a bitch," when the officer was out of the department's jurisdiction at the time he made those comments and was speaking privately to a person he considered to be a friend. *Id.* at 838. *Waters* is distinguishable on those facts. Unlike *Waters,* this case is not about "idle barroom chatter." *Id.* Here, Morris was in the jurisdiction, in full view and earshot of her co-workers, on duty, and publicly and loudly castigating a superior officer. *Waters* erects no per se rule that employee speech passes the *Pickering* test merely because profanity is included, and our holding

a job more insulated from the public view in order to minimize the negative effects of her conduct on the efficient administration of an important public office. She was fortunate not to be fired.

## IV. CONCLUSION

The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment in favor of the defendants.

---

today creates no per se rule that profane employee speech fails that test. In either situation, the employee's speech must be placed on the *Pickering* scale and considered in light of its manner, time, place, and context. *See Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899; *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693; *Givhan,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4.