[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 31, 2006
THOMAS K. KAHN
CLERK

No. 05-12207

_____

D.C. Docket No. 03-00822-CV-T-27-TGW

GARY MITCHELL,

Plaintiff-Appellant,

versus

HILLSBOROUGH COUNTY, a political
subdivision of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

**(October 31, 2006)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and JORDAN,[*] District Judge.

TJOFLAT, Circuit Judge:

---

[*] Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

Gary Mitchell, a former part-time employee of Hillsborough County ("the County"), appeals the district court's entry of judgment in favor of the County after a bench trial on his First Amendment retaliation claims brought pursuant to 42 U.S.C. § 1983. We are asked to decide whether distasteful comments made by Mitchell before the Hillsborough County Board of County Commissioners ("BOCC") touched on a matter of public concern and, if so, whether the County was nonetheless justified in terminating Mitchell's employment. Because we find that Mitchell's comments did not touch on a matter of public concern and, in any event, the County was justified in terminating Mitchell's employment, we affirm.

In part I of this opinion, we lay out the undisputed factual events that precipitated Mitchell's firing and subsequent lawsuit. In part II, we discuss why Mitchell's comments to the BOCC did not touch on a matter of public concern, and thus could not support a retaliation claim. Part III then discusses why, even if Mitchell's comments could be considered protected First Amendment speech, the County's interests in the orderly and efficient operation of its communication services overrides Mitchell's negligible interest in the speech at issue. Part IV briefly concludes.

I.

The parties do not dispute the underlying facts in this case. From September 1999 through April 18, 2002, Mitchell worked in the Hillsborough County Communications Department as a cameraman for the Department's television station, Hillsborough Television ("HTV"). The County owns and operates HTV, and its primary function is to provide live coverage of public BOCC hearings and meetings.[1] In addition to being employed part-time by HTV, Mitchell was a volunteer producer of television programs for the independent public access television station in Tampa, which is run by Speak Up Tampa Bay Public Access Television, Inc., a non-profit corporation ("Public Access").[2] Public Access receives partial funding from the County's general budget through a contract with the County.[3] Public Access operates separately from HTV, however, and the County has no control over its programming content.[4]

---

[1] HTV is broadcast twenty-four hours a day, seven days a week, locally on channel 22.

[2] Public Access is broadcast on cable channels 19 and 20 in the Tampa/Hillsborough County area.

[3] As pointed out below, this contract between the County and Public Access was discussed at BOCC meetings. We do not know the details of this agreement, however, because a copy of the contract is not contained in the record.

[4] Presumably, as the development of the "Public Access controversy" indicates, Public Access was required to operate in the public interest under its contract with the County, and the County was entitled to discontinue its funding in the event of a breach. Again, however, we do not know the precise wording of the contract because it is not in the record.

At the time of his termination, Mitchell was a camera operator for HTV who worked on the twenty-eighth floor of the County building, twenty-six floors above the BOCC's meeting room. Mitchell's job was to operate remotely four cameras located at fixed sites in the BOCC meeting room. As a cameraman, he positioned, framed and focused these cameras. His job did not require any regular interaction with BOCC members, as they relayed any requests or complaints directly to the HTV floor director located in the BOCC room.[5]

Mitchell was terminated by the County as a result of comments he made referencing Commissioner Rhonda Storms during an afternoon BOCC meeting on April 17, 2002. Mitchell attended the meeting on his own behalf, and not as a representative of the County. His comments were made during the time period set aside for open public discussion.[6]

---

[5] During his tenure with HTV, Mitchell had also assisted in the production of its programming as a floor director for BOCC meetings. At some time prior to his termination, however, Mitchell had been removed from duty as a floor director – a position with direct contact with members of the BOCC – because he had previously fallen asleep at a BOCC meeting. He testified at trial that he "was taken off the BOCC . . . meeting because of my medical condition . . . . I was never put into the BOCC meeting as a floor director after that. I was always a cameraman, CG operator." Mitchell testified that he fell asleep as a result of medication he was taking for a heart condition.

[6] Michael Foerster, the Director of the Communications for Hillsborough County, testified before the district court that the BOCC always sets aside a half-hour or forty-five minutes at the beginning of each regular meeting "for any citizen to come before the them with any matter that they wish to discuss or have . . . brought to the board's attention." Foerster did not know what was specifically on the agenda for the April 17, 2002 meeting, but he stated that the agenda could include as many as one hundred items. The record is also unclear as to the ground rules for the public

While the parties dispute whether Mitchell's comments touched on a matter of public concern, they agree that at the time of Mitchell's remarks, a public controversy had developed regarding the County's continued funding for Public Access. The Public Access debate began in earnest at an April 3, 2002 meeting of the BOCC. At that meeting, Storms questioned whether Public Access had violated its contract with the County by airing a program containing adult content. Public Access had aired the program without including a warning that it was meant for "mature audiences." Storms argued that this constituted a breach of contract and, as a consequence, the County should discontinue its Public Access funding.

The program in question, entitled "The Happy Show," had depicted a man reading a children's book aloud interspersed with scenes of nudity.[7] It is undisputed that the subject of this particular program, and the resulting debate over continued County funding for Public Access, had been the subject of numerous news media reports prior to Mitchell's termination two weeks later.

discussion portion of each meeting, including how much time each member of the public is typically given to speak.

[7] At the April 3, 2002, meeting, Commissioner Storms brought up the issue of funding for Public Access as a "budget item." She described the salacious and graphic content of the "Happy Show" program, and attempted to show excerpts to her fellow commissioners. The BOCC declined to watch the excerpts.

5

In accordance with the BOCC's usual practices, the next meeting, held on April 17, included a time set aside for open public comment. Commissioner Pat Frank opened up the meeting for public discussion by stating: "Now, we are going to discuss public access. We've spent a lot of time on this particular issue." Mitchell was the first to speak. He stood at the podium and made the following comments:

> Gary Mitchell, 808 East Chelsea. And I am here representing the Thunderheads, you see? [indicating a lightning bolt taped to his beret] The Thunderheads is a political support group, and we are looking for more people to support, such as yourselves; therefore, I've come to address you all, letting you know our services are available to you. Right at the moment we are in full complete support of Ms. Storms. She is wonderful in every way. We have the highest regard for her. We think she is correct in all of her thinking. I think there's a lot of people here that agree with me on that. Yes.
>
> [APPLAUSE]
>
> The only problem we have, Ms. Storms, is that our meetings since you brought up this preoccupation you have with other women's vaginas, we are – the meetings are degenerating into one side wanting to call you Vagi, and the other side are [sic] saying Gina, Gina [pronounced ji-nah]. My position is Gina, I think that's probably much more appropriate, okay? But I would like some time for you to make this clear to us which you would prefer to be called, Vagi or Gina, okay? Now, we're liable – we're happy to work with all of you for the rest of this. We love you. We love you. Do you mind if

I call you Vagi or would you prefer me call you Gina? I prefer Gina. Anyway, we are the Thunderheads, and the reason we're called Thunderheads is because storm clouds, you know, Thunderheads, storm clouds, yes. And we even – we even have our own special thunder wave, and we saved this for our best loving people. Now, we go [Mitchell stuck out his tongue and wiggled it] – like that, and that's only a sign of great respect and love. Now, of course, we have the thunder spring showers, which is the highest form, which is [Mitchell performed a raspberry] – okay. Fine. We wonder where the wave came from. Actually, it's –[8]

At this point, the bell indicating time was lapsing went off, and Commissioner Frank told Mitchell his time had expired.[9] There is no indication in the record as to how Storms or the other commissioners reacted to Mitchell's speech.

Michael Foerster, the Director of the County's Communications Department, Mitchell's ultimate boss, heard Mitchell's comments as he made them. He was in his office on the twenty-eighth floor watching the meeting on television. He testified that he had no idea what Mitchell was talking about, and that he did not connect the speech to the Public Access issue in any way. He

---

[8] A videotape of Mitchell's remarks at the April 17, 2002 BOCC meeting was admitted into evidence at trial and is part of the record.

[9] Foerster testified that, at the time Mitchell made his remarks, each speaker during the public comment period of a BOCC meeting was granted three minutes to speak and that a bell would sound when thirty seconds of a speaker's time was remaining. Frank informed Mitchell that his time was up not at the end of three minutes, but rather when the bell rang to signal that Mitchell had thirty seconds remaining. After Mitchell's comments, a number of other people spoke on the Public Access issue, some of whom supported Commissioner Storms.

construed Mitchell's speech to be a personal attack on Storms and was "deeply shocked and dismayed" by the remarks. Foerster decided immediately to terminate Mitchell.

Within an hour of Mitchell's comments, Foerster held a meeting with HTV station manager Greg Vawter[10] and production manager Steve McClure. Foerster instructed Vawter to fire Mitchell because "someone who comports himself in such a manner has lost my confidence as a director and certainly would lose the confidence of the entire staff[.]"[11] Vawter then went to McClure's office, where Mitchell was summoned and told that his services were no longer needed at HTV. Mitchell was informed that the termination was a result of his comments at the

---

[10] Vawter testified before the district court that in April 2002, HTV employed about 20 full-time and 25 part-time employees, roughly six of whom also did work for Public Access. Vawter also testified that he was shocked by Mitchell's comments, and that they were "personal and sexual in nature and didn't seem to me to be appropriate for the forum." Vawter expressed concern regarding his station's image with the BOCC.

[11] Foerster testified that after Mitchell's comments, Commissioner Storms had requested that no person from Public Access be at the studio during future BOCC meetings. It is unclear from the record exactly why Storms made this request, and when she made it.

Foerster also stated that, even though Mitchell would be twenty-six floors up during any future meetings, camera operators have the responsibility to "clearly frame the action" and take appropriate shots of the commissioners during the meetings. Foerster added that someone in Mitchell's position could "try to catch [the commissioners] when they're yawning or they're, you know, coughing or something. Or get them a little out of focus or try to get an unflattering angle. This is done all the time by people who are less than professional quality." Foerster admitted, however, that there had never been any complaints about Mitchell's work prior to his comments.

8

April 17, 2002 meeting.[12] Mitchell did not immediately take issue with his termination, instead simply nodding and leaving the office.

Mitchell filed this § 1983 suit in the Hillsborough County Circuit Court in April 2003. He alleged that the County violated his civil rights, in that his statements were meant to criticize the BOCC's "anti-First Amendment violations as it [sic] related to the public access television issue [.]" Mitchell claimed that his comments to the BOCC were protected speech; therefore, his termination as a result of those comments constituted retaliation by the County for the exercise of his First Amendment rights. This retaliation, Mitchell asserted, entitled him to relief under § 1983. Mitchell further argued that the County had no reasonable interest in firing him, since his position merely called for taking direction from the

---

[12] Mitchell was fired for insubordination and conduct unbecoming a County employee. Foerster testified that as a part-time, at-will employee, Mitchell worked "at our pleasure and discretion," and therefore the County could simply stop calling Mitchell for assignments. Foerster stated:

> [A]s an employee of Hillsborough County Television, I must demand the respect of all of our people toward our institution, we work for . . . if you had an employee who constantly criticized you, not only to your face, but to your friends, to everybody in the community, and ridiculed you, would you continue to hire that employee? That's the basis – that's the standard I used here, that this person – I could not have any confidence that this person was going to carry out the duties of Hillsborough Television in an objective impartial, and professional manner when he made such an outburst in front of the public.

9

technical director, and involved no interaction with BOCC members.[13]  Mitchell

sought declaratory relief and damages, including reinstatement to his part-time

position with HTV.  The County removed the case to the district court and the

parties consented to a bench trial before a magistrate judge.[14]

After considering the parties' submissions, the district court held that

Mitchell's speech before the BOCC did not touch on a matter of public concern,

and accordingly, was not protected by the First Amendment for purposes of

Mitchell's retaliation claim.  Moreover, the court, applying the balancing test first

articulated in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.

Ed. 2d 811 (1968), held that even if the speech could be "fairly characterized as

constituting speech on a matter of public concern," the County's interest in the

efficient and effective provision of services to the public outweighed any First

Amendment interest Mitchell had in his speech.  The district court thereafter

entered judgment for the County.  Mitchell now appeals.

---

[13] It is undisputed that BOCC members would not know who was on the twenty-eighth floor running the cameras during meetings, unless they specifically asked, and they would not see or communicate with cameramen such as Mitchell.  Vawter testified that it would be possible for Mitchell to work on other assignments besides BOCC meetings.

[14] Meanwhile, the Public Access funding controversy itself became the subject of litigation in the United States District Court for the Middle District of Florida.  The district court enjoined Hillsborough County from removing funding for Public Access in Speak Up Tampa Bay, et al. v. Board of Hillsborough County Commissioners, et al., Case No. 8:02-cv-1762-T-30MSS.

II.

A.

We review the district court's entry of judgment in favor of the County, after a bench trial, <u>de novo</u> as to the court's legal conclusions, including whether Mitchell's speech touched on a matter of public concern, and whether the court correctly applied the <u>Pickering</u> balancing test. <u>See, e.g., Watkins v. Bowden</u>, 105 F.3d 1344 (11th Cir. 1997); <u>Belyeu v. Coosa County Bd. of Educ.</u>, 998 F.2d 925 (11th Cir. 1993). We review the district court's findings of fact for clear error. <u>See</u>, <u>e.g.</u>, <u>Kona Technology Corp. v. Southern Pacific Transportation Co.</u>, 225 F.3d 595, 601 (5th Cir. 2000) ("The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo.").

In addressing a First Amendment retaliation claim, we first answer the threshold question: whether Mitchell's speech was protected under that Amendment. <u>Connick v. Myers</u>, 461 U.S. 138, 103 S.Ct. 1684, 75 L. Ed.2d 708 (1983).[15] If we find that Mitchell's statements did, in fact, touch on a matter of

_____

[15] The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend. I. Speech that does not meet <u>Connick</u>'s threshold "public concern" test is not protected under the First Amendment, and the government's

public concern, we then balance the competing interests at stake: the employee's interest in the protected speech is balanced against the government qua employer's interest in regulating its workplace and efficiently providing services. Id.[16] Both the threshold "public concern" question and the balancing analysis "are questions of law with respect to which the court is required to examine for itself the statements at issue and the circumstances under which they are made to determine whether or not there is First Amendment protection." Morales v. Stierheim, 848 F.2d 1145, 1148 (11th Cir. 1988).

A government employer may not demote or discharge a public employee in retaliation for speech protected under the First Amendment. See Rankin v. McPherson, 483 U.S. 378, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." (citing Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570

decision to terminate the employee comes within the "wide latitude in managing offices" afforded to the government as an employer. Connick, 461 U.S. at 146, 103 S. Ct. at 1690.

[16] In many retaliation cases, if the speech in question is found to touch a matter of public concern and the employee's interest in the speech is found to outweigh the government's interest in regulating the workplace, our analysis is not complete. We then ask two additional questions, both relating to causation: whether the speech in question "played a substantial part" in the decision to terminate the employee and whether the termination would not have occurred "but for" the speech in question. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002). The County concedes that absent Mitchell's comments before the BOCC, Mitchell would not have been dismissed and that the comments were the reason for his dismissal.

12

(1972)); Travers v. Jones, 323 F.3d 1294, 1295–96 (11th Cir. 2003) ("The law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech."). A government employee's speech is protected under the First Amendment if it touches on a matter of public concern. Akins v. Fulton County, 420 F.3d 1293, 1304 (11th Cir. 2005) ("If . . . a public employee's speech is on a matter of public concern, then the speech is protected."); see also Connick, 461 U.S. at 138, 103 S.Ct. at 1684.

In determining whether an employee's speech touched on a matter of public concern, we look to " the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. In doing so we ask: whether the "main thrust" of the speech in question is essentially public in nature or private, Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000),[17] whether the speech was communicated to the public at large or

---

[17]A number categories of speech have been held to be private and, thus, fall outside the realm of "public concern." When a public employee speaks not as a citizen, but as an employee, the First Amendment is not implicated. Morris v. Crow, 117 F.3d 449, 457 (11th Cir. 1997) ("The court must discern whether the employee spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." (internal quotations omitted)); Deremo v. Watkins, 939 F.2d 908, 910 (11th Cir. 1991) ("[C]ourts [must] consider whether the speech at issue was made in the employee's role as citizen or as employee."). An employee's quotidian, work-a-day grievances are not constitutionally protected because "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism . . . the First Amendment does not require a public office to be run as a roundtable for employee complaints[.]" Connick, 461 U.S. at 149, 103 S.Ct. At 1691. Likewise, "when public employees make statements pursuant to their official duties, the employees are not

13

privately to an individual, <u>Kurtz v. Vickrey</u>, 855 F.2d 723, 727–30 (11th Cir.

1988),[18] and what the speaker's motivation in speaking was.  <u>Morris v. Crow</u>, 117

F.3d 449, 457 (11th Cir. 1997) ("an employee's motive for speech, while not

dispositive, is a factor that must be considered in determining whether speech is a

matter of public concern").

Content is undoubtedly the most important factor in assessing whether

particular speech touches on a matter of public concern.  <u>Thomas v. City of</u>

<u>Beaverton</u>, 379 F.3d 802, 810 (9th Cir. 2004) (noting that if privately

communicated speech can satisfy the threshold test, speech' s content alone must

be sufficient to render it protected); <u>C.f.</u>  <u>Kurtz v. Vickrey</u>, 855 F.2d 723, 727–30

(11th Cir. 1988) (finding privately communicated speech to touch on a matter of

public concern).  In assessing the content of a public employee's speech, we look

to whether the speech communicates a  "subject of legitimate news interest [,] a

subject of general interest and of value and concern to the public at the time[.]"

---

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti v. Ceballos</u>, ___ U.S. ___, ___ 126 S.Ct. 1951, 1960, 164 L. Ed. 2d 689 (2006).  It is undisputed that Mitchell's speech before the BOCC was neither speech as an employee about work-a-day matters, nor speech pursuant to his official duties with HTV.

[18] Not all publicly communicated speech necessarily touches on a matter of public concern. <u>Deremo v. Watkins</u>, 939 F.2d 908, 911 n.3 (11th 1991) (noting that public communication of speech is not a dispositive factor).  Nor is all privately communicated speech necessarily outside the realm of public concern.  <u>Kurtz</u>, 855 F.2d at 727–30 (holding that a privately communicated comment touched a matter of public concern).

City of San Diego v. Roe, 543 U.S. 77, 84, 125 S.Ct. 521, 526, 160 L. Ed. 2d 410 (2004).[19]

Content, however, is not always a dispositive factor. Even statements with no news-worthy content can be protected. See Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988) (holding that, viewed in context, the statement "The one who is lying is you" could touch on a matter of public concern. ). On the other hand, when context and motivation are considered, even speech that, content-wise, lies near the core of the First Amendment's protection – archetypical public speech – may be deemed private speech. See Morris v. Crow, 117 F.3d 449, 457 (11th Cir. 1997) (noting that clear personal animus motivating polling site campaign sign waving may have been sufficient to render that speech essentially private under the Connick threshold test). Context may transform speech which, on its face, has no value to the public at large into protected speech. Morales, 848 F.2d at 1149 ("While the actual words . . . spoke[n] cannot be said to be valuable to the public at large, the first amendment's protections do not turn on the social worth of the statements." (internal quotations removed)).

B.

---

[19] The Supreme Court has noted that protection for public employees' speech on these matters is particularly valuable because "public employees are uniquely qualified to comment" on such matters. City of San Diego, 543 U.S. 77, 80, 125 S.Ct. 521, 523–24 (2004).

15

In addressing the threshold "public concern" question, the district court considered separately the content, context and form of Mitchell's speech, but the court's analysis turned primarily on the content of Mitchell's speech.[20] The court reasoned that the speech was wholly devoid of any content of value to a matter of public concern. In the court's view Mitchell's speech was either intended by Mitchell solely as a personal attack on Commissioner Storms, and thus was not protected, or – assuming arguendo that Mitchell's intent was not to insult Storms, but to comment on the Public Access controversy – no one listening to Mitchell's speech could possibly have divined that intent from the speech, and it could not be understood, Mitchell's intent notwithstanding, as anything other than an ad hominem attack.[21]

We agree with the district court that, viewed in isolation, there is nothing in the content of Mitchell's statements that can be said to touch on a matter of public

_____

[20] The district court did advert to the existence of some countervailing context and form evidence, but it emphasized that Mitchell's speech "served only to ridicule and show disdain" for Commissioner Storms and stated that "it is the personal nature of the plaintiff's comments, not the unsavory language he selected, that establishes that his comments do not satisfy the public concern prong of the retaliation analysis."

[21] The district court reasoned that, even assuming Mitchell's intent was to comment on the funding debate, his speech "strayed so far off target that the only perceivable purpose [was] a personal attack on Storms." On this point the district court relied upon Foerster's testimony at trial, where Foerster stated that, although he was fully aware of the funding controversy, he had no idea what Mitchell was talking about during his speech to the BOCC. The court reasoned that if Foerster did not make the connection between Mitchell's comments and the Public Access funding issue, "there is no reason to think anyone else would."

16

concern. Mitchell's speech mentioned neither the Public Access funding controversy, nor any of the issues involved in that controversy. Comprised solely of sophomoric name-calling and contempt-communicating expressive acts, there is nothing in the content of Mitchell's speech that communicated anything of value to a matter of public concern. Instead, content-wise, Mitchell's speech, could only be viewed as a personal attack on Commissioner Storms. Such ad hominem attacks, unaccompanied by any content touching an issue of public concern, cannot be said to touch on a matter of public concern.[22]

Mitchell does not argue that, on its face, his speech touched on a matter of public concern. Instead, Mitchell argues: that his intent was not solely to attack Storms personally, but also to satirize Storms's position in the Public Access funding controversy;[23] that viewed in context the satirical and humorous nature of the speech would have been understood by the audience; and that, therefore, taken

---

[22] If Mitchell's speech had contained some matters of public interest in addition to the personal attacks, the personal nature of the speech would not, standing alone, be sufficient to render the speech private. See Morris v. Crow, 117 F.3d 449, 456–58 (11th Cir. 1997). In Morris, we recognized that even speech that contains an "embarrassing, vulgar, vituperative, ad hominem attack" can touch on a matter of public concern if there is a sufficient quantum of content touching a matter of public concern mixed in with the attack. Id. Unlike in Morris, here the content of Mitchell's speech contained no such public interest element.

[23] Mitchell testified that his intent was both to ridicule Storms personally and to use that personal ridicule – through its purportedly humorous nature – to make a point about her position on the Public Access controversy. Mitchell testified that he was attempting to "address [the BOCC] in a way that would be different . . . something based on satire but still being relevant and maybe even caustic."

17

as a whole, in context, the speech commented on a matter of public concern.  In essence Mitchell argues that, taken in context, his statements purvey a message to his intended audience about the Public Access funding debate.

It is true that, when context, form, and motivation are considered, even speech with no inherent "social worth"  may touch on a matter of public concern. Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988).  Parody and satire, even when, as here, they take the form of a personal attack, may still be subject  to the protections of the First Amendment.  See Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L. Ed. 2d 41 (1988) (holding that First Amendment concerns negated a private right of action for intentional infliction of emotional distress arising from a vulgar parodic advertisement that personally attacked the Rev. Jerry Falwell).  Thus, if Mitchell's speech, when context, form and motivation are weighed, truly did act as a satire or parody, and the point of that satire or parody was to express a viewpoint in the Public Access debate, the speech could touch on a matter of public concern.

Viewing the record as a whole, there are a number of factors that weigh in favor of Mitchell's argument.   First, Mitchell's tone in delivering the speech was by no means or angry or vituperative.  Instead, Mitchell took a light-hearted, serio-comic approach, further accentuated by an absurd thunderbolt affixed to his hat.

18

These factors could easily have lead the audience to conclude that his intention was parodic.[24] Moreover, Mitchell gave his speech during a public comment period of a BOCC meeting[25] where the announced topic was the Public Access debate.[26] Thus, it may have been easy for the audience to have connected his speech – however unrelated in content – to that debate. The speech was communicated publicly – not relayed privately to Commissioner Storms. Finally, Mitchell testified that his comments were actuated by a desire to comment on the Public Access debate.

These factors, however, are simply insufficient to transform Mitchell's tasteless and vulgar <u>ad hominem</u> attack on Commissioner Storms into a comment on the Public Access debate.[27] First, there is reason to doubt Mitchell's motivation

---

[24] At least at first, however, the audience evidently did not pick up on Mitchell's tone-setting machinations as his original fulsome praise of Commissioner Storms – the eventual target of his ridicule – was greeted by applause rather than laughter. Once Mitchell moved from his mock-praise to the name-calling segment of his diatribe, the audience remained in apparently, and understandably, stunned silence.

[25] Such a public comment period – designated for citizens to exchange political ideas – though somewhat more limited than the archetypical public fora of streets and parks, implicates core first amendment concerns. See <u>Hague v. Comm. for Indus. Org.</u>, 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L. Ed. 1423 (1939) (discussing public streets and parks as core public fora).

[26] Immediately prior to Mitchell's speech, Commissioner Frank announced Mitchell by saying, "Now we are going to discuss public access . . . . So let me ask the first person. Gary Mitchell . . . . Could you come up quickly?"

[27] Neither the essentially <u>ad hominem</u> nature of Mitchell's speech nor its vulgarity rendered it completely private in nature. Unlike obscenity, see <u>Miller v. California</u>, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L. Ed. 2d 419 (1973), mere vulgarity – while afforded lesser protections – does not

argument. While Mitchell did testify that he set out to be funny and to satirize Commissioner Storms's position, Mitchell also admitted that he was angry at Commissioner Storms for raising the issue of de-funding Public Access and he further conceded that his speech was, at least in part, actuated by a desire to ridicule Storms personally.[28] Taken together, these admissions give Mitchell's satirical motivation argument a sheen of post-hoc rationalization. Dubious, after-the-fact, subjective justifications cannot, on their own, trump objective content.

Even if we were to accept Mitchell's argument that his speech was intended as a parody, however, as the district court notes, "[Mitchell's] method of expression completely obscured any message or idea other than a personal attack on Storms." Mitchell argues that his female physiology-invoking, adolescent

---

lie wholly outside the purview of the First Amendment. See FCC v. Pacifica Found., 438 U.S. 726, 744–48, 98 S.Ct. 3026, 3037–39, 57 L. Ed. 2d 1073 (1978) (holding that vulgar, offensive and shocking speech must be viewed in context when determining whether such speech is protected by the First Amendment). Ad hominem attacks, regrettably, are now often part of the core First Amendment concern: political discourse. See Hustler Magazine, 485 U.S. at 53–55, 108 S.Ct. at 881 (discussing the role that personal attacks – principally caricature – have played in political cartoons); Morris, 117 F.3d at 456–58 (holding that speech that contained both personal attacks and comments on matters of public concern may still pass the threshold Connick test). To hold that Mitchell's speech did not touch on a matter of public concern simply because it was styled as a personal attack would be to risk removing a large part of modern political discourse from the shelter of First Amendment protections.

[28] It is apparent from Mitchell's testimony that Storms's position on the Public Access debate left him hopping mad. Mitchell testified that Storms's suggestion that Public Access be de-funded made him very upset, as Public Access was very important to him. He felt his First Amendment rights were being violated because Storms was being "ridiculous" in singling out this one program and the issue of its depiction of female genitalia.

20

name-calling was meant to draw attention to Commissioner Storms' "continued reference to women's genitalia[.]" According to Mitchell, these references had resulted in female genitalia "becom[ing] synonymous with the Public Access issue."

This argument is not supported by the record. Commissioner Storms used the word "vagina" only twice during her comments on the Public Access debate.[29] That was hardly sufficient for the word to become so linked to that debate in the public consciousness for Mitchell's comments to be understood this way by his audience. Indeed, Foerster, who was fully aware of the Public Access controversy, testified that, upon hearing Mitchell's speech, Foerster made no connection between it and the controversy and that, indeed, he took the speech to be a personal attack on Storms. As the district court stated, if Foerster "did not make the connection [between Mitchell's speech and the Public Access debate], there is no reason to think that anyone else would."

Whatever Mitchell's intentions may have been in delivering his speech, the decisions he made in the form and language used to express his ideas sufficiently obscured those intentions from his audience so that the resulting message

---

[29] As the district court noted, the BOCC's discussion of the Public Access funding controversy at the April 3, 2002 meeting is documented in a thirty-two page, single-spaced transcript. Storms used the word vagina only twice during this discussion.

21

expressed had no connection to any issue of public concern. Mitchell's later attempt to explain away the nasty and personal nature of his speech does not change its content or make it relevant to the Public Access funding issue. Mitchell's comments are accordingly not entitled to First Amendment protection from retaliation.

III.

Because Mitchell's comments did not touch on a matter of public concern, the district court did not need to engage in the subsequent balancing of interests of the public employee and the government-qua-employer dictated by <u>Pickering v. Board of Education</u>, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed. 2d 811 (1968). Without First Amendment protection for Mitchell's speech, the County needed no overriding justification to terminate Mitchell's at-will employment. Nevertheless, the court did the <u>Pickering</u> balancing, concluding that even if Mitchell's speech was protected by the First Amendment, the County's interests in the operation of HTV without disruption or problem overrode any marginal interests Mitchell may have had in his comments. We agree.

As this court explained in <u>Morris v. Crow</u>, "[t]he First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack," even if such an attack touches on a matter of public concern.

22

Morris v. Crow, 117 F.3d 449, 458 (11th Cir. 1997). If the manner and content of an employee's speech is "disrespectful, demeaning, rude, and insulting," and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action. Id.; see also Morales v. Stierheim, 848 F.2d 1145, 1150 (11th Cir. 1988) (reasoning that an employee's "poor choice of words" could constitute a "disruption" to the county and impede its community development process).

The County was well within its discretion to terminate Mitchell for directly insulting and showing contempt for a BOCC member. Although a part-time employee, Mitchell frequently acted as a cameraman for BOCC meetings. After his speech at the April 17 meeting, Mitchell's supervisors lost confidence that he could continue to work for HTV without significant disruption, particularly after Storms requested that no Public Access employees be at the studio to work BOCC meetings after Mitchell's comments. Foerster was concerned that Mitchell's relationship with BOCC members was irreparably strained, and therefore the efficiency of HTV would be impaired by the change in Mitchell's work assignments. This was true even though Mitchell would not be coming in direct

23

contact with BOCC members, because he had important responsibilities in HTV production.[30]

We therefore agree with the district court's finding that, even if it is assumed that Mitchell's speech was entitled to First Amendment protection, the County's interest in the effective operation of HTV, free of any conflict with the BOCC, would outweigh Mitchell's interest in his speech. The evidence supports the court's finding that continuing to employ Mitchell after his insulting comments would impede the County's ability to perform its public duties – here, the functioning of HTV – efficiently and without disruption.

Both Foerster and Vawter testified that not only did they not understand the nature of Mitchell's attempted parody, they were extremely concerned about the effect of Mitchell's vulgar tirade on HTV's relationship with the County. HTV is charged with filming many different BOCC-related meetings and activities, and Mitchell's continued employment after his offensive remarks could potentially destroy the confidence BOCC and the County Administrator had in HTV. Given Mitchell's responsibilities with regard to filming BOCC meetings, we see no

---

[30] Mitchell's physical isolation from the BOCC would not prevent him from allowing his obvious personal distaste for Storms, or any other BOCC member, to affect his work. Mitchell could conceivably, through his control of the cameras used to broadcast BOCC meetings, contrive to catch a particular member at an unflattering angle or in compromising moments, such as yawns.

reason to dispute these concerns that led to the County's decision to terminate Mitchell.[31]  Mitchell provided no evidence at trial to demonstrate that the County's fears were unreasonable.[32]  As such, even assuming that Mitchell's speech touched on a matter of public concern, it is evident that his interest in making that speech was outweighed by the County's interests as an employer to regulate HTV and provide HTV's services efficiently.

## IV.

In sum, the district court correctly held that Mitchell's speech was not entitled to First Amendment protection.  Although it did not need to discuss

---

[31] The Supreme Court in Connick v. Myers reasoned that public employers do not have to wait for actual disruption or internal damage to take place, stating that "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick v. Myers, 461 U.S. 138, 152, 103 S.Ct. 1684, 1692, 75 L. Ed.2d 708 (1983); see also Waters v. Churchill, 511 U.S. 661, 674, 114 S. Ct. 1878, 1887, 128 L. Ed. 2d 686 (1994) ("Doubtless some speech is sometimes nondisruptive; doubtless it is sometimes of value to the speakers and the listeners.  But we have declined to question government employers' decisions on such matters.").  Here, even assuming Mitchell's speech had public value as satirical speech, we decline to question the County's decision to terminate Mitchell's part-time employment with HTV based on its determination that the speech was highly offensive and potentially disruptive.

[32] As previously discussed, although Mitchell attempted to claim that his activities on the twenty-eighth floor would not bring him in contact with the commissioners,  Foerster pointed out that BOCC members engage in various meetings all around Hillsborough County, including "town hall meetings," that would bring them in contact with HTV employees.  Moreover, Foerster stated that commissioners could come in contact with HTV employees anytime they were in the studio.  Mitchell's claim that he could work in anonymous isolation from the BOCC without a risk of future disruption is unreasonable.

Pickering balancing, we nonetheless agree that the County's interest in the efficient and effective operation of HTV outweighed any First Amendment interest Mitchell could have had in his speech. The district court's entry of judgment in favor of the County is therefore AFFIRMED.

SO ORDERED.